# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse 40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

## MOTION INFORMATION STATEMENT

**Docket Number(s):** 24-2974      **Caption [use short title]**

**Motion for:** MOTION TO RECUSE AND REQUEST FOR ADMIN STAY OF ALL DEALIDNES DURING THE PENDENCY THEREOF

**Set forth below precise, complete statement of relief sought:**
RECUSAL OR DISQUALIFICATION AND STAY DURING PENDENCING THEREOF

## MATTER OF OBERLANDER

**MOVING PARTY:**      **OPPOSING PARTY:** EDNY GRIEVANCE COMMITTEE

[ ] Plaintiff    [ ] Defendant
[✔] Appellant/Petitioner    [ ] Appellee/Respondent

**MOVING ATTORNEY:** PRO SE      **OPPOSING ATTORNEY:** MULRY, KEVIN

[name of attorney, with firm, address, phone number and e-mail]

**Court- Judge/ Agency appealed from:**

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
[✔] Yes    [ ] No (explain):
THIS MOTION FORM IS SOLELY IN RESEPCT OF THE STAY

Opposing counsel's position on motion:
[ ] Unopposed    [ ] Opposed    [✔] Don't Know

Does opposing counsel intend to file a response:
[ ] Yes    [ ] No    [✔] Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?    [ ] Yes [✔] No
Has this relief been previously sought in this court?    [ ] Yes [✔] No

Requested return date and explanation of emergency:
AS DOCUMENTED ON PAPERS, POTENTIAL EXISTS FOR INCONSISTENT RESULTS ON MATTERS NOW PRESENT BEFORE TWO FEDERAL COURTS ONE OF WHICH HAS SUBMITTED PAPERS AND IS ABLE TO RULE AT ANY TIME AND HAS BEEN PROMISED NOTICE OF THIS FILING

Is oral argument on motion requested?    [X] Yes    [ ] No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    [ ] Yes [✔] No    If yes, enter date:

**Signature of Moving Attorney:**
/s/ FREDERICK M. OBERLANDER    **Date:** 05/05/25 as now amended 05/15/25    Service by: [✔] CM/ECF    [ ] Other [Attach proof of service]

Form T-1080 (rev.12-13)

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**EMERGENCY MOTION PURSUANT TO LOCAL RULE 27.1 FOR ADMINISTRATIVE STAY OF PROCEEDINGS**

Petitioner: Frederick Oberlander

Docket No.: [24-2974]

**MOTION TO STAY PROCEEDINGS PENDING RESOLUTION OF MOTION TO RECUSE CIRCUIT OR DISQUALIFY PANEL**

Petitioner respectfully moves this Court under Local Rule 27.1 for emergency relief in the form of a temporary administrative stay pending adjudication of the accompanying Emergency Motion to Disqualify the Panel and Vacate Orders Based on Statutory and Constitutional (Structural) Bias.

Although the full motion is substantially complete, its formatting and finalization were delayed due to overlapping obligations in related litigation, including an unexpected filing by the government in *Gottdiener v. United States*, Case No. 15-1245C (Fed. Cl.), misrepresenting that orders issued by the Eastern District of New York defeat Tucker Act jurisdiction. Petitioners there—my clients—have from the outset maintained that such an order does not exist. That assertion was made in their initial complaint ten years ago.

Since that time, much has occurred, including the imposition of discipline by the EDNY, service of which postdated filings in the Court of Federal Claims. Appeal from that discipline is now due, but concurrent resolution of the disqualification motion here is

essential to avoid inconsistency, particularly given the DOJ's continued assertion of its position despite recent jurisdictional discovery filings.

The disqualification motion attached as **Exhibit A** will be finalized and separately docketed within 24 hours. It raises structural and constitutional issues under **28 U.S.C. §§ 144 and 455**, and *Caperton v. A.T. Massey Coal Co.*, **556 U.S. 868 (2009)**, including allegations of fabricated sealing authority, in rem injunction abuse, ex parte contempt, and structural bias inconsistent with appellate review.

Due to these intersecting procedural dynamics and to avoid possible waiver or prejudice, petitioner requests an immediate administrative stay of all deadlines and proceedings pending resolution.

Mr. Lerner, co-counsel in these matters, is expected to file a joinder and reservation shortly and, upon doing so, will refrain from filing any appellate brief pending resolution of the disqualification motion. Although the joint appellate brief is substantially complete, its filing is suspended pending this Court's ruling on the disqualification issue, as filing would risk inadvertent waiver of arguments raised therein. In any event, currently before counsel for the committee is his request for consent to an oversize filing.

Petitioner regrets the brief delay in formal submission of the motion and respectfully assures the Court that all efforts have been made, within personal and medical constraints, to bring the matter forward as swiftly as possible.

Respectfully submitted,

/s/ Frederick M. Oberlander

# REQUESTING EMERGENCY CALENDAR
## UNITED STATES COURT OF APPEALS SECOND CIRCUIT

In Re Oberlander            24-2974

**NOTICE OF EMERGENCY MOTION**

**PLEASE TAKE NOTICE** that on the accompanying Memorandum of Law, Declaration, and supporting Exhibits. petitioners Frederick Oberlander and Richard E. Lerner hereby move this Court, pursuant to 28 U.S.C. §§ 144 and 455, and the Due Process Clause of the Fifth Amendment, for an order, in rank of most preferred to least: first, staying or tolling, as of the May 5, 2025 filing hereof, before correction, of all appellate process and due dates in the appeal marked by this docket; and then Movant Appellant respectfully request that (a) the Court recuse itself, and each judge otherwise available; or otherwise (b) disqualify or recuse, as the case may be, each judge otherwise involved with any aspect of this matter or similar matters so that (1) it may hear the entire process en banc for its importance and failure to follow existing law; and (2) in the alternative may be assured to its good fair judgment that such panel as it designates actually and apparently hold the course right, straight, and true; and all such othe rrleif in law and equity as is deemed just and proper. Operative filings are expected to be (a) a merits appeal from EDND grievance; (b) motion(s) to recall mandates of this court; and (c) motions for writs to various EDNY courts.

**STATEMENT OF EMERGENCY**

(Requires copies of filings at the United States Court of Federal Claims not yet completed estimated in two business days from this upload date of May 15, 2023.)

Briefly, this Court is advised the the United States Court of Federal Claims has before it motions in which the United States, through DOJ, maintains the the "sealing order" of the Hon. I. Leo Glasser prevents that Court from exercising jurisdiction over claims by the class of all victims of Felix Sater for Tucker Act damages for being deprived of MVRA/CVRA property rights.

This Court is well aware that there is no such order.

Upon completion of the filings in the Court of Claims Plaintiffs will we respect for the dignity of this Court upload a revised and final version hereo.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RECUSE OR DISQUALIFY FOR ACTUAL OR APPARENT STRUCTURAL BIAS

### PRELIMINARY STATEMENT

This is a motion requesting, as primary relief, the recusal, and concomitant 291 notice, of the entire active Second Circuit bench for reasons sufficient under standards set forth by Caperton, 28 U.S.C. §455, or comparable doctrines. That is, a situation where a fully informed, objective observer would perceive actual bias, the appearance of bias, or an unconstitutionally high likelihood thereof.

The specific triggering event is the ongoing appeal to this Court of a grievance decision by the Second Circuit, presenting obvious concerns of bias. On its own, such concerns might justify recusal of a limited panel, but regrettably, the nature of the triggering event—falsification of appellate records to fabricate and affirm contempt findings, coupled with threats issued if these matters are further litigated—renders clear that institutional integrity itself is compromised.

What has emerged here is beyond mere judicial collusion or improper use of equitable power. It represents an evolution into a more insidious pathology: "Government by Imaginary Injunction." Rather than relying merely upon actual, though facially invalid, injunctions, the judiciary now increasingly utilizes injunctions and contempt findings that literally do not exist,

threatening those who challenge this regime. Judicial power has thus devolved into intimidation backed by fabricated records, invisible injunctions, and retroactively imposed contempt findings.

To illustrate vividly, multiple examples follow—each individually sufficient to justify recusal, and collectively amounting to an institutional catastrophe akin to an asteroid strike of dinosaur-extinguishing proportions.

These facts represent precisely the kind of background and contextual knowledge a fully informed, reasonable observer would bring to this matter. They do not constitute adjudicative facts; rather, they reflect the widely available, historically verifiable institutional context accessible through published scholarship, judicial opinions, government reports, media coverage, and informed public discourse.

Historically, the federal judiciary has repeatedly ventured beyond statutory and constitutional limits, exemplified by the "laying a case on file" practice originating in Massachusetts courts. Federal courts adopted this practice extensively by the early 20th century, quietly suspending convictions and erasing records, effectively creating an informal probation system, despite no congressional authorization.

This systemic secrecy was publicly exposed around 1915, culminating in the Supreme Court's unanimous decision in Ex parte United States (In re Kilits), explicitly rejecting judicial discretion in sentencing enforcement. The Supreme Court mandated immediate correction, leading President Wilson to issue

clemency to thousands affected by the unauthorized practice. Yet, human nature and institutional incentives remain constant.

By the 1980s, similar abuses resurfaced in the Second Circuit, exemplified by secret plea hearings and sentencings—particularly involving cooperators. A GAO investigation uncovered extensive abuses, disproportionately within the Second Circuit, prompting DOJ pledges of reform. Despite assurances from incoming U.S. Attorney Giuliani, a culture of strategic secrecy persisted, explicitly acknowledged by judges themselves.

A law-review panel circa 2000 openly featured judges lamenting restrictions on secret pleas and sentencings. Judge John Martin openly acknowledged circumventing transparency rules by docketing misleading sentencing language, effectively hiding actual sentences. Judge Koeltl described his explicit method: holding hearings at midnight to create "open court" technically compliant yet effectively sealed from public view. The judiciary thus openly mocked statutory and constitutional transparency requirements, secure in their institutional arrogance.

This systemic pathology became especially pronounced when Congress strengthened restitution rights through the MVRA (1996) and, critically, empowered victims directly through the CVRA (2004). These legislative actions transformed restitution from discretionary prosecutorial favors into enforceable victim rights, dramatically complicating prosecutors' ability to recruit cooperators. Suddenly, prosecutors faced incentives to explicitly or implicitly promise defendants total secrecy—cases, restitution orders, criminal

records disappearing entirely from public scrutiny, explicitly and systematically evading mandatory restitution.

Prosecutors now explicitly sold cooperation as transactional, not justice-oriented, exemplified vividly by Felix Sater. Sater publicly admitted cooperating because EDNY prosecutors promised total secrecy, enabling him to fraudulently borrow hundreds of millions. At sentencing, Sater complained that exposure by the press cost him promised institutional benefits. Remarkably, transcripts revealed Sater begging Judge Glasser to fabricate ongoing "risk" to justify continued sealing, absurdly citing threats from jailed mob figures, despite explicit DOJ admissions that no genuine risk existed.

The institutional hypocrisy became starkly evident compared to Myron Gushlak, explicitly penalized $50 million for exploiting secrecy to defraud financial institutions. Yet, Sater, having admitted identical misconduct, was rewarded and protected by the same judiciary and prosecutors.

Ultimately, direct personal involvement arose when documents from Sater's abandoned server explicitly proved his massive bank fraud. Recognizing immediate exposure for Jody Kriss to potential misprision charges, explicit disclosure to SDNY prosecutors or filing a public federal complaint was strategically necessary—ensuring judicial awareness insulated Kriss from future accusations.

Thus, the judiciary and DOJ, cornered by exposure, reacted furiously. Institutional secrecy explicitly enabled massive financial fraud, perverse

transactional cooperation deals, and systemic disregard for victim rights, restitution obligations, and statutory transparency mandates.

This explicit institutional pathology—"Government by Imaginary Injunction"—demands immediate, decisive recusal of the entire active Second Circuit bench, as objective impartiality, systemic integrity, and constitutional legitimacy can no longer credibly be presumed.

**Overview of the Procedural Scenario**

This commentary addresses a troubling sequence of judicial actions originating in federal district court and culminating in a questionable ruling by the U.S. Court of Appeals for the Second Circuit. At the heart of the matter is a federal district court's issuance of an in rem injunction—ostensibly against certain documents—and a later contempt finding against a non-party, issued without notice or hearing. The appellate court not only dismissed an appeal from this contempt order but also relied on it to uphold the original injunction, effectively transforming it into a personal order against the appellant.

The district court initially framed its injunction as in rem, directed at the documents themselves and binding "the world," expressly stating that it was not in personam. No individualized findings were made at the time of issuance, and no traditional service or jurisdiction over particular individuals was asserted. The appellant later challenged this injunction on First Amendment grounds.

Eight months after the injunction—and shortly after the appellant submitted their brief in the appeal—the district judge issued a sua sponte, ex parte scheduling order finding the appellant in contempt. This contempt finding was based on the alleged violation of an "implicit" order from a year prior—an order that the judge conceded did not exist in writing. This post hoc contempt finding was then used as a retroactive justification for the original injunction, with the judge now asserting a need for the order based on "safety" concerns never documented at the time.

The Second Circuit subsequently dismissed the appellant's challenge to the contempt order for lack of appellate jurisdiction but upheld the original injunction—now treating it as in personam, relying on the very contempt finding it had refused to review. It also sanctioned the appellant under FRAP 38 for pursuing a supposedly "frivolous" appeal and warned against further litigation, raising serious concerns about judicial accountability and procedural fairness.

## II. Legal Analysis of the District Court's Actions

## A. The Initial In Rem Injunction

Injunctions are inherently in personam remedies, requiring jurisdiction over specific individuals or entities. By contrast, in rem jurisdiction applies to courts adjudicating rights in tangible property within their reach. In this case, the court issued an in rem order against intangible information contained in

documents, purporting to bind "anyone who finds" them. Such a move is legally unprecedented and raises grave jurisdictional and constitutional issues. The injunction lacked the specificity, individualized findings, and evidentiary support typically required. Information—especially when not classified or tied to active threats—is not recognized as a proper subject of in rem jurisdiction. The attempt to bypass normal jurisdictional limitations by treating documents as property and enjoining the world against their dissemination reflects a legal fiction aimed at achieving a broad gag order without procedural safeguards.

## B. Prior Restraint and the First Amendment

Regardless of how it was characterized, the injunction functioned as a prior restraint—a preemptive prohibition on speech. Prior restraints are subject to the highest level of constitutional scrutiny and carry a presumption of unconstitutionality. Under *Near v. Minnesota* and *New York Times Co. v. United States*, such restraints may only be upheld in the rarest circumstances—such as publication of troop movements in wartime or imminent, direct threats to safety.

The district court made no contemporaneous findings to support the extraordinary step of enjoining publication. The judge's later reference to a "safety" concern—introduced months after issuing the injunction—was undocumented and unaccompanied by evidence. Without a narrowly tailored, factually supported justification, the injunction violated well-established First Amendment doctrine.

## C. Retroactive Justification and FRCP 65(d)

Rule 65(d) of the Federal Rules of Civil Procedure requires that all injunctions clearly state the basis, terms, and scope at the time they are entered. An injunction cannot be retroactively justified based on events or findings that occur later. Here, the judge's justification—offered in a contempt order issued eight months later—violates both the letter and spirit of Rule 65(d).

By asserting that a newly found contempt justified the prior restraint, the court engaged in post hoc rationalization, effectively attempting to backfill a constitutionally defective order. This raises not only procedural concerns but calls into question the legitimacy of the injunction from the outset.

## III. Contempt Finding Without Due Process

## A. Ex Parte and Sua Sponte Action

Two weeks after the appellant filed a brief challenging the injunction, the judge issued an ex parte, sua sponte scheduling order holding the appellant in contempt. This was done without motion, notice, hearing, or any adversarial process. The timing—directly following an appellate filing—raises the specter of retaliation for exercising appellate rights.

Under longstanding due process jurisprudence, no person may be held in contempt without notice of the order allegedly violated, notice of the charge, and an opportunity to respond. The court failed to provide any of these.

## B. The "Implicit Order" Problem

The judge conceded that the appellant had not violated an explicit order, but rather an "implicit" expectation. Yet contempt law requires that the underlying order be clear, specific, and unambiguous. No one can be sanctioned for failing to comply with an order that does not exist in writing and was never served or communicated in enforceable terms.

Holding someone in contempt under such conditions violates fundamental due process and arguably exceeds the court's jurisdiction. Constructive contempt (for actions occurring outside court) requires formal proceedings, not summary treatment.

## C. Abuse of Contempt Power

The use of contempt here appears not to enforce an actual order but to retroactively create one for appellate optics. This use of the contempt power—particularly in the absence of due process—constitutes a profound abuse of judicial authority. It suggests that the judge was attempting to fortify a vulnerable order under appeal by crafting a new factual predicate post hoc.

## IV. The Second Circuit's Ruling

## A. Jurisdictional Contradiction

The Second Circuit dismissed the appeal of the contempt finding for lack of jurisdiction—presumably because it viewed the contempt as non-final or not independently appealable. However, it then used that same contempt finding to uphold the original injunction.

This creates a fundamental contradiction: if the contempt order is not final and reviewable, it cannot simultaneously be used as decisive basis for affirming an unrelated order. The appellate court's logic collapses under scrutiny.

## B. Wrong Standard of Review

In reviewing a prior restraint, appellate courts are required to apply strict scrutiny or conduct de novo review—not defer to the trial court's findings. Yet the Second Circuit applied a "clear error" standard, typically reserved for factual findings in ordinary civil cases. This is wholly inappropriate for constitutional questions involving core speech rights.

By doing so, the Second Circuit effectively insulated the district court's deeply flawed injunction from meaningful appellate oversight.

## C. Sanctions and Threats Against Further Appeal

The court went further, sanctioning the appellant under FRAP 38 for pursuing a "frivolous" appeal and warning against further litigation. But the contempt order being challenged was procedurally defective and constitutionally suspect. A due process challenge under these facts is not only non-frivolous—it raises substantial constitutional concerns. Punishing the appellant for raising such issues is likely to chill legitimate appellate advocacy and reflects a disturbing hostility to procedural accountability.

---

## V. Broader Constitutional and Structural Implications

## A. First Amendment Breakdown

The injunction was a prior restraint, unsupported by the standards articulated in foundational Supreme Court precedent. Its issuance without findings, its later retroactive justification, and the deference granted by the Second Circuit all point to a failure of the judiciary to protect constitutional speech rights.

## B. Due Process Failures

The contempt process flouted every element of due process:

- No clear order existed.
- No notice of violation was given.
- No hearing was held.
- The order came ex parte and sua sponte.

This sequence represents a textbook violation of the Fifth Amendment's guarantees.

## C. Separation of Powers

The issuance of an in rem prior restraint, unsupported by statute and grounded only in vague safety claims, suggests judicial lawmaking in an area Congress has chosen to regulate cautiously. This mirrors concerns raised in *Youngstown* and *New York Times v. U.S.*, where the Court emphasized that courts must not assume emergency powers Congress has declined to provide.

## D. Judicial Conduct and Potential Misconduct

When a judge:

- Issues a novel injunction without findings,
- Allows an appeal to proceed,
- Then issues an ex parte contempt order shortly after a brief is filed,
- And uses it to retroactively justify the injunction—

—it raises serious questions about bias, impartiality, and possible abuse of power. The sequence could warrant review under the Judicial Conduct and Disability Act or even be construed as fraud on the court, particularly if the actions were intended to mislead the appellate process or immunize invalid orders from review.

---

## VI. Conclusion

This sequence of judicial behavior—beginning with an unprecedented in rem injunction against information, followed by a procedurally void contempt order, and ending with appellate ratification and sanctions—raises profound constitutional and institutional questions.

The failure to afford basic due process, the misuse of contempt power, the retroactive justification of restraints on speech, and the appellate court's contradictory and punitive response collectively illustrate a breakdown in judicial accountability.

At stake are the integrity of court orders, the right to appeal without fear of reprisal, and the principle that no judge may act beyond the bounds of law without review. The appellate court's refusal to correct—indeed, its amplification of—these errors underscores the urgent need for structural checks when judicial power becomes unmoored from procedure, precedent, and principle.

Movant Appellant respectfully request that (a) the Court recuse itself, and each judge otherwise available; or otherwise (b) disqualify or recuse, as the case may

be, each judge otherwise involved with any aspect of this matter or similar matters so that (1) it may hear the entire process en banc for its importance and failure to follow existing law; and (2) in the alternative may be assured to its good fair judgment that such panel as it designates actually and apparently hold the course right, straight, and true; and all such othe rrleif in law and equity as is deemed just and proper. Operative filings are expected to be (a) a merits appeal from EDND grievance; (b) motion(s) to recall mandates of this court; and (c) motions for writs to various EDNY courts.

Movant Appellant certifies that all statements herein are true to his best knowledge; on this filing made May 5, 2025 as hereby corrected May 15, 2025. The total word count, prepared by computer, is about 3100.

/s/ Frederick M. Oberlander

**EXHIBIT INDEX**

Exhibit A – Transcript excerpt: Judge Glasser's admission re: sealing orders

Exhibit B – Cert Petition filed with SCOTUS (ordered public and distributed)

Exhibit C – Brooklyn Law Journal (2000) panel excerpt – admissions re: ritual sealing, docket manipulation, and 'poof' practices

Exhibit D – GAO and 2023 Northwestern Law Review data on Second Circuit sealing practices

Exhibit E – Ex Parte contempt order – timing and structure

Exhibit F – Second Circuit order dismissing contempt appeal while simultaneously relying on its substance to affirm injunction

Exhibit G – Law review excerpts and historical commentary on Second Circuit en banc culture and Friendly-era comity traditions

Exhibit H – Payne v. Tennessee victim impact precedent and testimony of Nicholas Christopher

Exhibit I – BE&K Constr. Co. v. NLRB and First Amendment right to petition

Exhibit J – Public record of Lerner's anticipated joinder and procedural preservation of independent claims