# 24-2974

## United States Court of Appeals for the Second Circuit

---

GRIEVANCE COMMITTEE OF THE
EASTERN DISTRICT OF NEW YORK,

*Petitioner-Appellee,*

v.

FREDERICK M. OBERLANDER

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR RESPONDENT-APPELLANT

FREDERICK M. OBERLANDER, ESQ.
THE LAW OFFICE OF FREDERICK M. OBERLANDER, P.C.
*Respondent-Appellant Pro Se*
43 West 43rd Street, Ste. 133
New York, New York
(646) 901-1574
fred55@aol.com

# I.    TABLE OF CONTENTS

I.    TABLE OF CONTENTS..................................................................1

II.   TABLE OF AUTHORITIES........................................................3

III.  STATEMENT AS TO ORAL ARGUMENT .................................4

IV. CROSS ADOPTION; Standard of Review; Issue(S); PRELIMINARY
STATEMENT; *Anagnorisis* Ensues.............................................5

    A.    Cross Adoption of This Categorical Appeal  Complementing Co-Appellant
Lerner's Empirical Appeal ....................................................5

    B.    Issues Presnted: *Caperton* Bias and Fraud on the Court............................5

    C.    Standard of Review Is De Novo.................................................5

    D.    Preliminary Statement: Hier Ist Ein Warum— *Vorgeblich* .........................6

    E.    Corruption Begins, Not With a Bang, But  With a Whimper.....................8

V.    ARGUMENT: A Constitutional Crisis in Plain Sight: FIVE Frauds,
Interbranch Collusion ..........................................................12

    A.    The Record Establishes a Multi-Layered, Systemic Fabrication...............12

    B.    A Timeline of the Fabrication .................................................14

    C.    Part I: The Legislative Caging of Judicial Power: The 1831 Contempt Act as
a Constitutional Mandate ....................................................18

        i.    The Monarchical Ghost: Suspicious Origins of Contempt Power ............18
        ii.   Impeachment of Judge Peck: A Nation's Rebuke to Judicial Tyranny.......19
        iii.  "And None Other": A Rigorous Textual Analysis of 18 U.S.C. § 401 .......21

    D.    Collapse of Lawful Process: Autopsying the March 23, 2011 Order ........24

        i.    Factual Predicate: The *Sater* Secrecy and the Oberlander Litigation........24
        ii.   B. The Legal Nullity of a "Presumed Order" ...........................................26

iii.  The Contempt Power as a Tool of Judicial-Executive Collusion .............. 28

E.  Constitutionalization of Bias: A *Caperton* Analysis of Judicial Motivation30

i.  A. The Objective Standard of Due Process ............................................... 30

ii.  Temptation Too Great to Tolerate: Vengeance, Retaliation, and Institutional Self-Preservation .............................................................................................. 31

F.  The Actions of the Judiciary Created Constitutional Nullities Of Frauds on the Court and Overt Displays of Intolerable Bias ............................................... 34

G.  Emergence of A Pathocracy: An Explanation for the Constitutional Collapse 34

H.  The Historical Precedent: A 170-Year-Old Institutional Habit ................ 35

I.  B. The Psychological Engine: "Monsters from the Id" .............................. 36

J.  The Normalization of the Pathology: A Training Manual for Corruption 37

VI.  Historical-Philosophical Roots of the Crisis .................................................... 44

A.  The Emergence of a Pathocracy: Monsters from the Id (cont'd…) .......... 44

B.  Part V: A Flaw in the Constitutional Design? The Crisis of Judicial Accountability ...................................................................................................... 46

VII.  CONCLUSION ............................................................................................. 48

## II.   TABLE OF AUTHORITIES

*Caperton v. A.T. Massey Coal* Co., Inc., 556 U.S. 868 (2009) .................................. 30

*Craig v. Harney*, 331 U.S. 367 (1947) ....................................................................... 9

### III.   STATEMENT AS TO ORAL ARGUMENT

Request for oral argument will be by formal motion.

## IV. CROSS ADOPTION; STANDARD OF REVIEW; ISSUE(S); PRELIMINARY STATEMENT; *ANAGNORISIS* ENSUES

### A. CROSS ADOPTION OF THIS CATEGORICAL APPEAL COMPLEMENTING CO-APPELLANT LERNER'S EMPIRICAL APPEAL

Appeal is had from those aspects of all decisions of Appellee EDNY Grievance Committee which, if held error, are *categorically structural* error, requiring vacatur or reversal without consideration of harmlessness. Appellant incorporates by reference, adopting in full force and effect, as if fully set forth herein, the appellant's brief filed by Richard Lerner (ECF ____, No. 18-2782) addressing complementary *errors*, including those subject to harmlessness analysis, so is intended to align seamlessly with this to ensure comprehensive review. Recognizing that categorical classification of error is inherently undecidable, Appellant respectfully asks this Court to align and resolve these complementary appeals in the interest of justice despite any overlap.

### B. ISSUES PRESNTED: *CAPERTON* BIAS AND FRAUD ON THE COURT

The issues presented herein exclusively address (1) *Caperton*-level judicial bias, requiring recusal based on objective appearance of bias violating due process; and (2) **Fraud on the Court**, as established by *Hazel-Atlas*, involving deliberate deception undermining judicial integrity.

### C. STANDARD OF REVIEW IS DE NOVO

**Standard of Review:** Review is *de novo* as to all questions of law and fact, given the structural and constitutional character of the claims raised.

### D. PRELIMINARY STATEMENT: HIER IST EIN WARUM — *VORGEBLICH*

Cicero began argument by what Quintilian later called *captatio benevolentiae* to elicit a court's goodwill, establish *ethos*, credibility, and *pathos*, emotional connection. But to do that would be artifice, and this case has no room for it, it is too important.

Had he foreseen Rome's coming cataclysm, Cicero would have broken all his stylistic and forensic rules to warn them. He had, almost, in *Philippics*, where his style degenerates into a hybrid of invective, prayer, and near-prophetic denunciation. Even there, he held structure. Why? He believed in the Republic's ability to correct itself, still thought *mos maiorum*, ancestral virtue, could restrain Antony. Had he known that collapse of the Republic by *Lex Titia*, a Second Triumvirate, and proscription were near, and Brutus pretext for empire, not cure, he would have *abandoned structure itself*, to preserve what it had been built to protect. He was *magister* of his rhetorical form, not ir *servus*. As am I *magister* of mine *I repay him **for the sake of his history** by giving him a second chance to sound the alarm here, **for the sake of our future**. In sum:

**Μὴ λέγε τοῖς Λακεδαιμονίοις ὅτι τὸ ἔθος παρέβην· ἀλλὰ λέγε ὅτι αὐτὸν ἐτελέσσα.**

DO NOT TELL THE SPARTANS THAT I BROKE THE PHALANX OF TRADITION;
RATHER, TELL THEM THAT BY BREAKING IT, I FULFILLED IT.

As Demosthenes said, "For relief requested, I ask in humility, *"Does this Court remember what relief is, is it still uncorrupted by the times."* It is not insult, but rhetorical self-test, calibrating *judicial strategic empathy*; I ask the Court to search itself, see is it still part of law or without knowing but part of procedure. *That's the ask*. And I ask one thing more: I include the next anecdotes for a reason: *anagnorisis*. I *can't force the Court to read it, but if it does not, before long history may well force it to wish that it had.*

Oedipus thinks he's in control, a ruler solving a mystery, finding the killer of King Laius in belief that truth is something external he can see with reason. But detail won't fit. A messenger says something too familiar, timing too perfect, and Oedipus' assumptions unravel. The world he thought he was in collapses: the story was *not* about an external mystery, but about *him*. *He* was inside it all along, digging *his* own grave, believing *he* was getting closer to truth when truth was getting closer to *him*.

The point? My father captured an SS officer in WWII. He surrendered; my father took his compass as a prize, dropped him at a collection center, then got back in the war. Like most GIs, he had no idea what SS was. Later, liberating Buchenwald, he found out. But though he came home in 1945 and I came along in 1955, I knew none of this till he told me in 1995. I played with that compass as a boy, took it to show and tell, but as my father hadn't known the truth at first, neither had I, so I never saw the blood on it. And though it's 30 years since he told me, I still see his face, 70 but 20 again, transported back to the camp when he told of the bodies. The stench. The living who envied the dead. Then he got cold. Color left his face as, staring at a never-forgotten horror only he could see, said, "If I'd known when I found him, I don't know what would have happened." Had he known, put a bullet in the man's brain, nothing would have happened ...*really*? He lived for 20,000 days and nights after that encounter. In how many would he have awakened screaming at what he'd done, and if none, what would it say about his loss of empathy. The point is, while no one should be judged *in extremis*, maybe someone, perhaps fate, was looking out for him *knowing that being shown too much too soon can kill as well as a a bullet*. It's my turn now to add, ***but being shown too little too late will kill even better***.

## E.    CORRUPTION BEGINS, NOT WITH A BANG, BUT WITH A WHIMPER

This is not a story that is easy to tell, nor one that will be easy to hear. The record that follows is direct refutation of a narrative that has been maintained by the courts for over a decade. It contains evidence of what can only be described as a systemic, multi-layered, deliberate fabrication of fact and law by officers of the court.

The purpose of this brief is not to argue that the system made a series of errors; it is to prove that the system itself, when threatened, became a criminal enterprise.

This is a truth that this Court may not wish to confront. It is an indictment that strikes at the very heart of judicial integrity. But I swore an oath to uphold the Constitution, and protecting this Court from an uncomfortable truth was not part of that oath. The evidence is what it is, and my duty is to present it, without flinching.

On June 21, 2010, after an open court hearing, the presiding federal judge, the Hon. Leo Glasser, admitting that he had no power to enjoin the reporting of what transpired, nonetheless ordered a court reporter to alter the official transcript with the specific intent, *as then U.S. Attorney Loretta Lynch later confirmed **to this Court**, that what happened in open court **not be a public fact.*** That is a federal judge and future Attorney General collaborating in an act of obstruction.

Yet this Court's panel did not disbar the U.S. Atroney or refer the judge. No, ***it agreed***, granting Loretta Lynch′s request and holding that the right to disseminate what was said and heard in open court would be made criminal by the ″case being sealed as a whole,″ a finding made despite an appellate record devoid of any such order. This act was, itself, a fraud on the court, in defiance of this Court′s and the Supreme Court′s clear precedent that no court has authority to enjoin reporting of

what transpires in an open courtroom *a fortiori* if they were there to hear it. *Craig v. Harney*, 331 U.S. 367 (1947).

But something far more serious occurred. The court did not just affirm a fraudulent record; *it used that record to validate the retroactive creation of a crime*. This is the ultimate issue on appeal: the corrupt, fraudulent, and impeachable misconduct by which this Court's panel *purported to create a* **criminal contempt conviction ex nihilo** *to hide the truth, lest the pathocracy responsible, which this Court "owns," collapse.*

That said, this brief is strictly limited to the evidence necessary to resolve the matter at hand. The systemic pathology it reveals is deep and has a long history, but this is not the place to dredge up every historical injustice, from Eugene Debs to *Korematsu*, from MKUltra to the present day. The record of this case is, on its own, a sufficient and devastating indictment. We will confine our analysis to that record.

On June 14, 2010, Judge Glasser (EDNY) held the second of four hearings to determine how I'd come to documents of Felix Sater's conviction and cooperation. Before court I informed him I would not participate in closed proceedings without public notice of application for closure followed by a public First Amendment hearing on closure and he agreed then and each session after that they would not be closed. Of interest is an excerpt where he confirmed having no evidence he'd issued a sealing order, and that he never entered an order binding me…see *infra*. But conintiung….

I testified on June 21, as did my client and Sater, whom we knew on sight, Sater in his real name. At the end he asked to seal the session; the judge refused. He asked him to enjoin us from saying what we'd seen/heard, his identity. The judge refused,

noting no federal judge had power to bar disseminating what happened in open court, had he such, would not use it, but at Sater's request ordered the transcript *altered*.

This is from a letter brief filed June 2011 by appellee United States in 10-2905 CA2 by Loretta Lynch, then U.S. Attorney, EDNY, signed by an AUSA in her name:

> Roe argues that because Judge Glasser conducted an evidentiary hearing on June 21, 2010, which was open to the public, and "declined to order anyone in the court not to say who Mr. Doe is," he is free to disclose the information contained in his first request. However, Judge Glasser conducted the hearing, at least in part, to determine how Roe had obtained sealed and confidential documents in contravention of the existing sealing order. At the time of the hearing, as is true today, the case was sealed as a whole. It would prove a remarkable development if the very hearing investigating a possible breach of a court's sealing order led to the publication of facts subject to that order. It was also clear that Judge Glasser did not intend to allow Doe's identity to become a public fact as a result of the hearing. This is evidenced by his order to the court reporter at the conclusion of the hearing that any reference to Sater's name be changed to John Doe in the transcript of the proceedings.

Interestingly, the reporter transcribed his order to alter her official transcript:

*A sitting judge, former law school dean, admitting his awareness that no judge can enjoin anyone from repeating what happened in open court, so declining to seal it or order anyone not to speak, altered an official transcript with, the US Attorney says, specific intent that what happened in open court not be public fact. And a reporter acquiesced, which in a normal world would be prosecuted and she flipped to cooperate and reveal how many other times she did this. And a US Attorney not reporting the judge to public integrity, or finding it unusual for a judge to do that.* ***In fact, she's telling this Court that it was just a way to ensure that he didn't have what had been said in open court wind up public fact.***

***And, this Court didn't disbar her or refer her to public integrity either: No, it affirmed, holding that Appellant' right to disseminate what was said and heard in open court was subject to, and if spoken would be made criminal by, the "case being sealed as a whole" in a decision which is fraud on the court for purporting to affirm violation of such order despite clear appellate record that no such order existed.***

No, it ***agreed,*** granting Loretta Lynch's request, holding that the right to disseminate what was said and heard in open court was subject to, and would be made criminal by, the "case being sealed as a whole," a finding made despite an appellate record devoid of any such order. This act was fraud on the court, in defiance of this Court's and the Supreme Court's precedent that no court has authority to enjoin reporting of what transpires in an open courtroom. That is this appeal: the corrupt, fraudulent, and impeachable misconduct by which this Court purported to create criminal punishment *ex nihilo* to conceal truth, lest the pathocracy responsible, which this Court "owns," collapse. Add something more serous about a criminal conatmpt

## V.   ARGUMENT: A CONSTITUTIONAL CRISIS IN PLAIN SIGHT: FIVE FRAUDS, INTERBRANCH COLLUSION

### A.   THE RECORD ESTABLISHES A MULTI-LAYERED, SYSTEMIC FABRICATION.

The legitimacy of American constitutional order rests on a core, foundational promise: the judiciary is a bastion of impartial justice, operating under the strictures of law, not the caprice of individual judges. This case calls this fundamental promise into question, transforming a single judicial order into a Kantian framework, a lens through which a long-festering emergent systemic crisis becomes finally visible.

The purported criminal contempt order issued on March 23, 2011, by the United States District Court for the Eastern District of New York is not merely legal error; it is the visible manifestation of deep and corrosive pathology that has taken root within the federal judiciary and executive branches.

The events surrounding this order, in totality, constitute a multi-faceted *fraud on the court*, revealing a constitutional crisis in all its "glory" unfolding through multiple concomitant violations of the *Caperton* minimum standard of due process.

*First is the underlying institutional fraud of a fabricated secret.* The record shows the case at the heart of this dispute was, in fact, public record, and the narrative of its "sealing," at leat in any cognizable form, was a retroactively constructed fiction.

*Second is the legal fraud of a "presumed order."* Having fabricated the existence of a secret, the court invented a non-existent command to justify punitive reataliatory action against Appellant, repudiating *two centuries of legislative history*.

*Third is the constitutional fraud of biased proceedings.* The objective standard of due process articulated in *Caperton v. A.T. Massey Coal Co.* was violated (a) by a

federal district judge acting as both prosecutor *and* arbiter in a cause that directly implicated his and the court′s integrity and their role in the initial fabrication; (b) *by this Court* in facilitating those acts by methods and means including backdating events and timelines and fraudulently misrepresenting the nature and consequence of the orders; (c) by Appellee EDNY Grievance Committee in sitting in judgment of Appellant for revealing the frauds despite its legal and undoubtedly facual

**Fourth is the use of the contempt power itself as an act of concealment.** The contempt order was a weapon deployed not to vindicate the law, but to silence Appellant who all-too-credibly threatened to continue legally exposing these frauds.

**Fifth is the abuse of court closure and concealment to destroy vicitms' lives by the worst of all possible thefts,**

**the contempt power itself as an act of concealment.** The contempt order was a weapon deployed not to vindicate the law, but to silence Appellant who all-too-credibly threatened to continue legally exposing these frauds.

This sequence of events does more than detail the travails of a single litigant. It illuminates a perilous synergy between the judicial and executive branches, where the courts′ coercive powers are used to enforce a collusive pact of secrecy that serves the executives illicit operational demand while shielding the judiciary′s procedural misconduct from public scrutiny. Ultimately, this exposes a fundamental flaw in the American constitutional design: the absence of an effective and routine check on a judiciary that chooses with or at the behest of the executive to operate outside the law to the extent that its participants are emboldened to straight-facedly argue in

other federal courts that the judiciary may at the executive's request complicitly give it a hall pass to excuse it from performing its duties under Take Care.

When the guardians of the law themselves become its violators, the system of checks and balances faces its most severe test. This Appeal will deconstruct this crisis, moving from the specific, documented fabrications to the broader systemic and psychological failures they represent.

## B.   A TIMELINE OF THE FABRICATION

The factual predicate of this case is not a linear series of events, but a timeline of escalating contradictions, where official court findings are directly refuted by on-the-record statements and documentary evidence.

- ➢ **2004: The Public Record.** The case file for *U.S. v. Felix Sater* (98-cr-1101) is transferred to the National Archives and Records Administration (NARA) in an unsealed box and is made publicly available. This status as a public record is later confirmed by NARA itself.

- ➢ **June 14, 2010: The First Admission.** In a hearing transcript, Judge I. Leo Glasser states unequivocally that no order was ever directed at Appellant: **"So when your letter asks me to show you what order is directed to Mr. Oberlander, there isn't any."**

- ➢ **June 21, 2010: The Second Admission.** Judge Glasser clarifies that his injunction against the dissemination of Sater's Presentence Report is *in rem* (against the document), not *in personam* (against Appellant). He explicitly says

that Appellant's knowledge or alleged wrongdoing is irrelevant to this decision and he is unsure he has authority to enforce a sealing order on a non-party.

➢ **February 2011: The Prosecutor's Admission.** AUSA Todd Kaminsky allegedly writes to the Second Circuit, stating there is no evidence of any risk to Sater and the government can no longer ethically pretend there is.

➢ **March 23, 2011: The "Presumed Order" and Contempt Finding.** In direct reversal, Judge Glasser issues a written order finding Appellant in criminal contempt. He bases this on violation of a "presumed order" that he concludes "must be presumed... to have existed," in part because of the "danger to the life of John Doe." This finding is made *sua sponte*, without the notice, hearing, or any of the due process required by Federal Rule of Criminal Procedure 42.

➢ **April 11, 2011: The Government Confirms Appellant's Statement and in dong so disavows this Court iself when it filed its brief in the CA2 case and noted therein that on June 21, 2010, while issuing the injuction on the PSR Judge Glasser expressed serious doubt whether he could enforce a saeling order againsat a non-party, and asked for briefing, making it quite impossible that he had, according to this Court's version os history, alraey held Appeallant in contempt of the sealing order as this Court would have one believe. See pgs. 43-44. ECF 179, 10-2905 CA2.**

➢ **April 27, 2011: The Third Admission.** In an *ex parte* transcript, Judge Glasser explains his contempt order by admitting he had no knowledge a sealing order ever existed when he made his prior statements. He states: **"I had no knowledge it ever existed which is why I made that statement on**

**the record at one point. I couldn't find any order directing that anything be sealed."** He explains the sealing must have happened via a verbal "so ordered" on an unremembered date, documented on a "day sheet" he had never seen before the prosecution recently found it.

➢ **June 29, 2011: The Appellate "Retcon".** The U.S. Court of Appeals for the Second Circuit issues an order affirming the 2010 injunction. This order claims that on June 21, 2010, Judge Glasser had based his injunction on "his finding that [appellant] had contemned his sealing order" and on the "physical danger to Doe." *This appellate finding is directly contradicted by the transcript from that day, in which the judge expressed doubt about his authority to enforce a sealing order against a non-party and stated the appellant's conduct was irrelevant.*

➢ **March 27, 2013: The "Sent in Error" E-mail.** After the Solicitor General serves Appellant with a secret *ex parte* order from Judge Glasser, AUSA Kaminsky demands its return, stating in an email: **"this document was sent to you in error by the Solicitor General and not intended to be viewed by you."** *This order, stunningly, acknowledges Sater's sentencing took place "in open court," a fact that would obliterate any justification for the ongoing injunctions against Appellant.*

This timeline establishes the foundational reality: the entire legal proceeding was built upon a "sealed case" that was public record and a "violated order" that the

judge admitted did not exist. The subsequent contempt finding and appellate affirmation were retroactive fabrications designed to conceal this reality.

C.     PART I: THE LEGISLATIVE CAGING OF JUDICIAL POWER:
         THE 1831 CONTEMPT ACT AS A CONSTITUTIONAL MANDATE

To grasp the profound illegality of the March 23, 2011, contempt order, one must exhume the history of the power it purports to exercise. The federal contempt power is not, as some judicial opinions might suggest, a boundless and mystical authority inherent in courts. **It is a power granted by <u>Congress</u>, and more important, a power deliberately and strictly limited by Congress.** The history of this limit is a story of a political and constitutional confrontation between legislative democracy and judicial prerogative. The modern contempt statute, 18 USC § 401, is living legacy of that confrontation, a legislative cage built to contain a power the nation's founders and their successors rightly feared.

### i. The Monarchical Ghost: Suspicious Origins of Contempt Power

The contempt power wielded by American courts is a transplant from English common law, and it carries the DNA of its monarchical origins. In England, the power was not primarily a tool for maintaining decorum or enforcing judgments; it was an instrument for protecting the dignity and authority of the King. Disobedience to a court's decree was an affront to the sovereign, and punishment was meted out to vindicate royal authority. This concept was fundamentally incompatible with the principles of the new American republic, which was founded on popular sovereignty, *the belief that government and its officers are servants of the people, not their masters.*[4]

Reflecting this deep-seated republican skepticism, the framers of the Constitution did not view a broad, summary contempt power as an essential

component of the "judicial power" conveyed by Article III.[5] The Federalist Papers are silent on the matter, and many revolutionary-era state constitutions, when they addressed the power at all, granted it to the legislative branch, not the judiciary.[5] This historical context directly refutes the modern judicial mantra that the power to punish for contempt is "inherent in all courts."[2] which appears to be less a feature of the original constitutional design and more of a post-ratification judicial invention, a self-serving declaration of authority that the historical record does not support.[5]

Early Supreme Court cases began to articulate a theory of "implied powers" that "must necessarily result to our Courts of justice from the nature of their institution".[1]Later, in cases like *Ex parte Robinson*, the Court, while acknowledging the existence of a statutory framework, simultaneously asserted that the contempt power "is inherent in all courts," justifying it as essential for self-preservation.[2] This created a foundational and unresolved contradiction. On one side stands the historical and legislative record, which shows a deliberate withholding and later curtailment of this power. On the other stands the judiciary's subsequent self-declarations of its own authority. This conflict reveals that the judiciary's claim to an "inherent" power that exists beyond statutory boundaries is not a faithful interpretation of constitutional history, but an attempt to reclaim a scope of authority that the Founders intentionally denied and that Congress, in a moment of national crisis, explicitly took away:

### ii. Impeachment of Judge Peck: A Nation's Rebuke to Judicial Tyranny

The abstract constitutional debate over the scope of contempt power was thrust into the center of American political life by the tyrannical actions of a single

federal judge: James Peck of Missouri. In 1826, Peck presided over a contentious land grant case and, following the custom of the time published his opinion in a local newspaper. An attorney for the losing side, Luke Lawless, responded with his own anonymous letter to the editor, which offered a sharp but respectful critique of the judge's legal reasoning. Enraged by public challenge to his authority, Peck summarily hauled Lawless into court, held him in criminal contempt without a jury, sentenced him to 24 hours in prison, and suspended his license to practice law for 18 months.

This naked abuse of judicial power to silence and punish a critic provoked a national firestorm. The House of Representatives, recognizing it as a fundamental assault on republican principles, impeached Peck. The articles of impeachment charged that he had acted "to the great disparagement of public justice, the abuse of judicial authority, and to the subversion of the liberties of the people of the United States". Tthough Peck was narrowly acquitted in the Senate by a single vote, the impeachment trial served as a national seminar on the dangers of unchecked judicial power. The political consensus that emerged was overwhelming and clear: the common law power to punish out-of-court criticism as contempt was a dangerous relic of monarchy, incompatible with a free press and the liberties of a free people.[3] The trial demonstrated that the line between vindicating the authority of the court and vindicating the personal honor of the judge was too thin and too easily crossed. Judges, Congress concluded, could not be trusted with the discretionary power to be the arbiters of their own dignity when faced with public criticism.[1]

Congress responded immediately and decisively. On March 2, 1831, it passed "An Act declaratory of the law concerning contempts of court".[7] This statute was not

a minor procedural tweak; it was a profound legislative judgment on the proper role and temperament of the federal judiciary. *Its express purpose was to strip federal judges of the very power Peck had so egregiously abused*. The Act was a prophylactic measure, designed to prevent the very kind of retaliatory judicial behavior that arises when a judge's actions are publicly questioned and exposed. It accomplished this by strictly limiting the contempt power to three, and only three, specific categories of conduct:

➢ Misbehavior committed in the physical presence of the court, or so near as to physically obstruct the administration of justice.

➢ Misbehavior by an officer of the court in their official transactions.

➢ Disobedience or resistance to a lawful court order, writ, process, rule, decree, or command.[7]

By limiting the power to acts physically obstructing justice or defying specific, lawful orders, Congress abolished the judiciary's ability to punish for perceived disrespect, out-of-court criticism, or any other conduct that merely wounded a judge's pride.[3] The legislative history is dispositive: the 1831 Act was intended to be, and understood by all to be, complete replacement of a nebulous common law contempt power with a clear, limited, statutory one.[1]

### iii.   "And None Other": A Rigorous Textual Analysis of 18 U.S.C. § 401

The core limitations enacted in 1831 have endured for nearly two centuries, a testament to a lasting congressional intent to keep the judicial contempt power on a short leash. They are now codified at 18 U.S.C. § 401. The modern statute begins

with a phrase that is both a grant of power and its simultaneous, emphatic limitation: "A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, *and none other*, as—".[8]

The phrase "and none other" is the cornerstone of the entire statutory scheme. It is an explicit and unambiguous statement of legislative preemption. It extinguishes any lingering claim to a parallel, "inherent" common law power that might exist alongside the statute. A federal court either has the authority to punish an act under one of the three enumerated subsections of § 401, or it has no such authority at all.[1]

The third subsection, § 401(3), the provision relevant to the case at hand, grants courts the power to punish "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command".[8] Decades of case law, and even the U.S. Department of Justice's own internal guidelines for its prosecutors, have established a clear, three-part test for securing conviction under this subsection: proof, beyond a reasonable doubt, of the existence of three essential elements:

- ➢ There was a violation;
- ➢ of a clear and reasonably specific order; and
- ➢ the violation was willful.[10]

The absence of any of these elements is fatal to a contempt charge in § 401(3). The requirement of a "clear and reasonably specific order" is paramount. It is a bedrock principle of due process, ensuring that individuals have fair notice of exactly what conduct is forbidden before they can be punished for engaging in it. A person

cannot willfully disobey a command that is not clearly communicated or, as will be argued, does not exist at all.[11]

Furthermore, the word "lawful" in the statute is not mere surplusage; it functions as a critical jurisdictional prerequisite. An order is "lawful" only if the court had the authority and jurisdiction to issue it in the first place, and only if it comports with due process and other applicable statutes and rules.[11] This has profound implications for cases involving judicial secrecy. If a court's method of sealing a case or document is itself unlawful—for example, if done sub silentio, without proper motion, public hearing, or written finding of cause as required by law—any subsequent order seeking to enforce that secrecy is not a "lawful order" within the meaning of § 401(3). An order that perpetuates underlying illegality cannot itself be "lawful." **A court acting in this manner is not enforcing law; it is exceeding its jurisdiction as defined by Congress.[1]**

But the historical arc from Peck to § 401 reveals a foundational constitutional flaw that this case brings into stark relief. The legislative branch, through the 1831 Act, exercised its plenary and exclusive constitutional authority to define and limit the jurisdiction of the federal courts. However, the judiciary's persistent claim to an "inherent" power that Congress cannot touch represents a direct challenge to that authority. ***If the judicial branch can simply declare, "We possess inherent powers that you, the legislature, cannot limit," then the legislative check on the judiciary is rendered meaningless. The judiciary becomes the sole and final arbiter of the limits of its own authority, which is the very definition of unchecked power. The 2011 contempt order at the heart of this analysis is a modern manifestation of this long-***

*running, unresolved constitutional conflict, an instance where a court reverted to a claim of inherent power that Congress had explicitly and constitutionally abolished.*[1]

### D.    COLLAPSE OF LAWFUL PROCESS: AUTOPSYING THE MARCH 23, 2011 ORDER

Armed with a proper understanding of the strict statutory and historical limits on the contempt power, it becomes possible to perform an autopsy on the specific contempt order issued by Judge I. Leo Glasser on March 23, 2011. A clinical examination of the facts and the language of the order reveals that it was not a legitimate exercise of the limited authority granted by 18 U.S.C. § 401. Instead, it was a reversion to the pre-1831 practice of punishing for defiance of the court's general authority, rather than for disobedience to a specific, lawful command. The order punished contempt of a "presumed order"—a legal fiction that has no place in American jurisprudence and which served as the enforcement mechanism for a collusive pact of secrecy between the judicial and executive branches.[1]

#### i.   Factual Predicate: The *Sater* Secrecy and the Oberlander Litigation

The controversy is rooted in the long-running and deeply, and deeply illegally, secret criminal case of *United States v. Felix Sater*. In 1998, Sater, a businessman with ties to organized crime, pleaded guilty in the Eastern District of New York to his role in a massive $40 million stock fraud scheme.[13] In exchange for his plea, Sater became a cooperating witness, Judge Glasser *supposedly*, certainly to hear him tell it, sealed the entire criminal action, including its very existence on the public docket.[17] The

case supposedly remained shrouded in secrecy for over a decade, even after he was finally sentenced in 2009.

This illegal wall of secrecy – and it wasn't even secret, since he was sentenced in open court, Judge Glasser admits no one asked him to and so he did not seal the record of it, and the entirety of Sater's case had been filed publicly in the National Archives almost since inception, which would have been impossible had it been sealed – was destroyed when Appellant, an attorney representing clients who were victims of Sater's financial frauds, came into possession of documents from the case. These included Sater's cooperation agreement and his Presentence Investigation Report (PSR). Believing the information contained within them documents was crucial to essential to his clients' legal safety and civil claims against Sater and his associates, Oberlander filed a public civil RICO complaint in the Southern District of New York in May 2010, attaching portions of the materials as exhibits.

This filing triggered a swift and forceful judicial reaction. Judge Buchwald of the Southern District ordered the complaint sealed. The matter was then taken up by judges in the Eastern District, the original venue of the Sater case. A series of orders were issued by Judge Glasser and later by Judge Cogan, who was appointed to oversee compliance. They variously directed Oberlander to cease disseminating materials, return physical copies of the PSR, and to destroy any electronic copies.

The conflict escalated as Oberlander, now joined by attorney Richard Lerner, continued what courts described as a relentless campaign to expose the information, arguing that the secrecy surrounding the Sater case was evidence of a covert justice system hidden from public view; that there were no sealing orders; and even if there

were they could not bind him for lack of jurisdiction over him as a non-party.[19] *It was in this highly charged atmosphere that Judge Glasser issued the criminal contempt order at the center of this analysis.* On March 23, 2011, Judge Glasser found that Oberlander "had *knowingly and intentionally flouted a Court order*" by "*unilaterally deciding*" that he could as of First Amendment right disclose information on Sater's criminal case.[17]

### ii.   B. The Legal Nullity of a "Presumed Order"

The March 23, 2011 contempt order is facially void because it fails to satisfy the most fundamental requirement of 18 U.S.C. § 401(3): it does not identify the "clear and reasonably specific order" that was allegedly violated. The language of the court's finding is a confession of its own legal infirmity. Judge Glasser did not state, "Mr. Oberlander is held in contempt for violating Paragraph X of the Court's order dated Y." Instead, he found that Oberlander had "flouted a Court order" by "*unilaterally deciding*" to disclose information.[20]

This phrasing is a fatal flaw. The contempt statute does not punish an individual for "unilaterally deciding" anything. It punishes the physical act of "disobedience or resistance" to a specific, existing, lawful command.[8] By focusing on Oberlander's state of mind and his decision-making process, the court abandoned the objective standard required by the statute and reverted to a subjective one based on perceived defiance. It was, in effect, punishing Oberlander for not sharing the court's view that all information related to the Sater case must remain secret forever, regardless of whether a specific order prohibited a specific disclosure. This constitutes punishment for contempt of a "presumed order." The court acted as if

there were a blanket, unwritten, all-encompassing order of perpetual silence that attached to the very subject matter of the Sater case. Any disclosure related to that subject was therefore seen as a "flouting" of the court's general authority.[1]

A "presumed order" is no order at all. It is a legal nullity that cannot support a finding of criminal contempt. The law, particularly criminal law, demands precision. A defendant must be able to look at a written order and know exactly what conduct is proscribed. An obligation that is merely presumed or inferred from a judge's general disposition does not provide the fair notice required by the Due Process Clause and the plain text of § 401(3).

This use of a "presumed order" represents the ultimate subversion of due process. The constitutional guarantee of due process requires, at its core, fair notice of what conduct is prohibited so that an individual may conform their behavior to the law. A "presumed order," by its very definition, provides no notice. It is unstated and unknowable until the moment it is retroactively enforced. This fundamentally shifts the legal burden. In a system governed by the rule of law, the state bears the burden of proving that an individual violated a clear, pre-existing rule. In a system governed by a "presumed order," the burden shifts to the individual, who must somehow divine the unexpressed will of the judge and anticipate his displeasure. This transforms the court from a neutral arbiter of law into a dispenser of arbitrary punishment, a regression to the very star-chamber-like practices the Constitution was designed to prevent. The court's choice of vague, behavioral language like "knowingly and intentionally flouted" and "unilaterally deciding" serves as an implicit admission of its own legal weakness. A court that can point to a clear, specific, written command

that has been violated will invariably quote that command in its contempt finding to make its authority plain. The resort to ambiguous, psychological descriptions of a defendant's conduct is a strong indicator that no such clear command exists. It is a rhetorical strategy to obscure a fatal substantive defect: the absence of a specific violated order. This approach shifts the legal basis for the contempt from the objective act of disobedience to the subjective attitude of defiance. This is precisely the standard of "contempt of the court's dignity" that was prevalent in English common law and which motivated the impeachment of Judge Peck and the passage of the 1831 Contempt Act to abolish it.[1] The 2011 order was, therefore, not merely an error; it was a repudiation of 190 years of settled legislative and legal history.[1]

### iii. The Contempt Power as a Tool of Judicial-Executive Collusion

The issuance of a void contempt order based on a legal fiction raises a critical question: why would a federal court take such a legally perilous step? The answer appears to lie in the convergence of interests between the judicial and executive branches. The contempt power in this case was not wielded to vindicate a neutral principle of law, but to enforce a pact of secrecy that served the mutual, and mutually improper, interests of the judiciary and the U.S. Attorney's Office.[1]

The executive had a clear and compelling interest in maintaining the secrecy of the Sater case. Public disclosure of the full extent of his cooperation and the benefits he received could make it more difficult to recruit such assets in the future.

The judiciary, in turn, had its own interest in maintaining that secrecy. Having engaged in the legally questionable practice of sealing the entire case—not just

specific documents, but its very existence on the docket—for over a decade, the court had a vested reputational interest in preventing the public exposure of its methods. Oberlander's public filings and accusations of a "covert justice system" were a direct threat to the judiciary's claims of transparency and adherence to the rule of law.[19]

In this context, the contempt order becomes the enforcement mechanism for a symbiotic, extra-legal pact. The executive branch's desire for secrecy provided the powerful justification (or pretext) for the court's actions. The judiciary's formidable contempt power provided the coercive tool needed to enforce that secrecy when it was breached. This collusion created a dangerous feedback loop. A judge, acting alone, might be hesitant to issue a legally baseless order that could be overturned on appeal. But, when the judge's actis align with the powerful interests of the executive branch, the judge feels institutionally empowered, validated, and shielded. The executive's need for secrecy emboldens judicial overreach, and the judicial overreach, in turn, serves the executive's needs. This dynamic helps to explain the extremity of the court's response. The use of a void "presumed order" was a high-risk legal maneuver, but one more palatable by the fact that it was done in service of a shared goal with the most powerful litigant in the federal system: the United States itself. government. The collusion was not merely an outcome of the events; it was a causal factor in severity of judicial misconduct, creating an environment where far greater abuse of power became possible than either branch might have tried on its own.

E.    **CONSTITUTIONALIZATION OF BIAS:**
      **A *CAPERTON* ANALYSIS OF JUDICIAL MOTIVATION**

Beyond the statutory invalidity of the contempt order under 18 U.S.C. § 401, its issuance raises profound questions about judicial impartiality that implicate the Due Process Clause of the Fourteenth Amendment. The circumstances surrounding the order, viewed through the objective lens provided by the Supreme Court in *Caperton v. A.T. Massey Coal Co.*, reveal a constitutionally intolerable risk of actual bias. An objective, reasonable observer would not see a neutral arbiter dispassionately enforcing a lawful command; they would see an aggrieved institution and its officers using the awesome power of contempt as a weapon for retaliation and concealment.[1]

### i.   A. The Objective Standard of Due Process

In its landmark 2009 decision, *Caperton v. A.T. Massey Coal* Co., Inc., 556 U.S. 868 (2009)the Supreme Court confronted the issue of when the appearance of bias in a judge becomes so extreme that it violates the constitutional guarantee of due process.[21] The case involved a West Virginia Supreme Court justice who refused to recuse himself from a case involving a coal company whose CEO had spent $3 million to help get that justice elected. The justice then cast the deciding vote to overturn a $50 million verdict against that same company.[22]

The U.S. Supreme Court held that due process required the justice's recusal. In doing so, the Court articulated a new, objective standard for judicial disqualification that goes beyond proof of actual, subjective bias. The Court held that recusal is constitutionally required in situations where "the probability of actual bias

on the part of the judge or decisionmaker is too high to be constitutionally tolerable".[21] This inquiry does not require a litigant to prove that the judge was, in fact, biased. Rather, the central question is whether, "under a realistic appraisal of psychological tendencies and human weakness," the judge's interest in the case "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented".[25]

The standard is explicitly objective, based on what a "reasonable and prudent person" would perceive from the totality of the circumstances, not on the judge's own protestations of impartiality.[21] As Justice Anthony Kennedy wrote for the majority, a judge's subjective search for his own bias "is just one step in the judicial process; objective standards may also require recusal whether or not actual bias exists or can be proved".[26] While the specific facts of *Caperton* involved extraordinary campaign contributions, the constitutional principle it announced is far broader. It applies to any situation where "extreme facts" create an objective appearance of bias that would "offer a possible temptation to the average man as a judge... not to hold the balance nice, clear and true".[25] *Caperton* thus constitutionalized an objective "appearance of bias" standard, providing a powerful analytical tool to scrutinize not just financial conflicts, but any form of judicial interest that threatens the core guarantee of a neutral arbiter.[1]

### ii. Temptation Too Great to Tolerate: Vengeance, Retaliation, and Institutional Self-Preservation

Applying the objective *Caperton* standard to the March 23, 2011 contempt order reveals a serious risk of actual bias that rises to an unconstitutional level. In this

case, the judge′s ″direct, personal, substantial″ interest was not pecuniary, but it was arguably more potent: it was reputational and institutional. The judge was not a detached magistrate adjudicating a dispute between two outside parties; he was a central figure in the controversy. An objective observer, presented with all the facts, would be compelled to conclude that the probability of a vindictive and retaliatory bias was ″too high to be constitutionally tolerable″. Key facts lead to this conclusion:

> **The Nature of the ″Offense″:** The conduct being punished by the contempt order was not a routine disruption of court proceedings or a simple failure to comply with a scheduling order. The conduct was the public exposure of the judiciary′s secret handling of a major criminal case and the explicit public accusation that this secrecy constituted a ″covert justice system″.[19] Oberlander′s actions were a direct and frontal challenge to the court′s authority and, more pointedly, to its fundamental integrity. This placed the judge in an adversarial posture, forcing him to defend not just a single order, but the reputation and legitimacy of the court itself.[1]

> **The Identity of the Target:** The formidable power of criminal contempt was wielded against the very individual who was making these damaging public accusations. This creates the classic and dangerous scenario of a judge using the power of the office to silence a critic. A ″realistic appraisal of human weakness,″ as the *Caperton* court requires, suggests a powerful temptation for a judge in this position to act out of personal pique and a desire for retribution, rather than out of a dispassionate need to uphold a neutral law.[25]

> **Disproportionality and Illegality of the Response:** The use of the criminal

contempt power, particularly on a specious basis like violation of a "presumed order," appears an extreme, disproportionate response. Rather than measured application of the law, it looks like the deployment of the court's ultimate weapon to crush an adversary. When a court resorts to legally void and facially invalid means to punish a critic, objective observers will reasonably conclude that the motive is something other than the neutral administration of justice.

The *Caperton* decision is fundamentally about circumstances that create a temptation for a judge to stray from the path of impartiality. While the temptation in that case was gratitude for financial support, the temptation in this case is arguably even more primal: the desire for institutional self-preservation and retaliation against an accuser. A judge's interest in protecting the judiciary's institutional reputation—and perhaps concealing its systemic misconduct—from public scrutiny can be at least as powerful a motivator as any campaign contribution. This case, therefore, represents a critical and logical extension of the *Caperton* principle from purely financial conflicts of interest to institutional and retaliatory conflicts of interest.[1]

The contempt proceeding against Oberlander was not merely a case *before* the judge; in a very real sense, it was a case *about* the judge and the judicial system he represented. The judge was sitting in judgment of his own critic. In this context, the act of presiding becomes a weaponization of impartiality. The judge uses the robes, the gavel, and the veneer of a neutral process to achieve a partial and retaliatory outcome. This destroys the very impartiality the process is meant to guarantee, creating a sham proceeding that violates the core of due process. Under these

extreme circumstances, the probability of bias—a vindictive, self-protective bias aimed at punishing an antagonist and suppressing embarrassing revelations—is "too high to be constitutionally tolerable." The failure to recuse and the subsequent issuance of a legally baseless contempt order constituted a clear violation of the Due Process Clause as interpreted by the objective standard of *Caperton*.

## F.  THE ACTIONS OF THE JUDICIARY CREATED CONSTITUTIONAL NULLITIES OF FRAUDS ON THE COURT AND OVERT DISPLAYS OF INTOLERABLE BIAS

➢ The proceedings were void for lack of a predicate order and a complete deprivation of due process under the Fifth Amendment.

➢ The secret nature of the proceedings violated the Sixth Amendment right to a public trial.

➢ The system's deliberate deceptions constitute a fraud on the court under *Hazel-Atlas Glass*.

## G.  EMERGENCE OF A PATHOCRACY: AN EXPLANATION FOR THE CONSTITUTIONAL COLLAPSE

The record detailed in Part I establishes a multi-layered and systemic fabrication. The legal analysis in Part II demonstrates that this fabrication resulted in a "constitutional nullity." A rational observer is left with one, unavoidable question: How could such a thing be possible? How could a system of respected jurists and federal prosecutors engage in a years-long "performance art" that required them to invent orders, falsify records, and openly defy the Constitution?

The answer is that this was not a series of isolated mistakes or the work of a few rogue actors. It was the predictable and emergent behavior of a system that has become a **pathocracy**—an institution whose internal logic is no longer governed by the rule of law, but by a pathological instinct for self-preservation. This section will provide the historical and psychological framework necessary to understand this systemic collapse.

## H.    THE HISTORICAL PRECEDENT: A 170-YEAR-OLD INSTITUTIONAL HABIT

The "performance art" of a secret, parallel justice system is not a modern invention. The institutional habit was born in the moral catastrophe of the 1850s. The Fugitive Slave Act of 1850 created a system of federal commissioners who were financially incentivized to deny due process, paying them twice as much to return an alleged fugitive to slavery than to set them free. This was the first, and most blatant, example of the federal government creating a judicial system designed not to find truth, but to produce a predetermined, politically necessary outcome. It was a system that, by its very design, self-selected for officials willing to place government convenience above the written law.

The nation's first great constitutional crisis over judicial tyranny came to a head with the impeachment of Judge James H. Peck, who used the contempt power to punish a lawyer for criticizing his opinion. The subsequent **1831 Contempt Act** was Congress's definitive and permanent legislative judgment on this issue. It was a cage built to contain judicial overreach, explicitly stripping judges of the power to punish for perceived disrespect and limiting their authority to the enforcement of

clear, lawful orders. The events in this case are a direct and willful defiance of that 200-year-old legislative command, proving the truth of Santayana's warning: "Those who cannot remember the past are condemned to repeat it."

I.  B. THE PSYCHOLOGICAL ENGINE: "MONSTERS FROM THE ID"

The Constitution was designed by Enlightenment thinkers to contain the predictable vices of rational men—"knavery" and "roguishness." It has no built-in defense against a system that has become collectively irrational. The pathology is driven by the psychological phenomenon of **identity fusion**, a state where an individual's sense of self becomes inextricably linked to their group. A threat to the institution is perceived as a direct, personal, and existential attack.

This is the central lesson of the film *Forbidden Planet*. The invisible, murderous monster that destroyed an advanced civilization was not an external enemy; it was the **"Monster from the Id,"** the physical manifestation of the subconscious rage of a single, brilliant individual whose mind was fused with a powerful machine. The judicial system is that machine. When it felt threatened by the exposure of its secrets, it unleashed its own "Monsters from the Id"—the fabricated orders, the altered records, the bad-faith arguments—to destroy the source of that threat. These are not the actions of rational actors; they are the panicked, self-destructive lashing out of a system in a state of psychotic decompensation.

**J.** **THE NORMALIZATION OF THE PATHOLOGY: A TRAINING MANUAL FOR CORRUPTION**

This pathological behavior has been normalized and even taught. In a 2000 Brooklyn Law School panel discussion, a group of the most senior and influential judges in the EDNY and SDNY openly workshopped the mechanics of creating **"sham trial dates," "feigned proceedings,"** and other forms of "performance art" to achieve outcomes they deemed necessary. This was not a secret meeting; it was a published law review article. It was the system holding a masterclass in its own corrupt methodology, all under the guise of "honest" debate about difficult choices.

This discussion reveals the system's true philosophy, as articulated by its most influential members: that the law is a mere "guideline," and that a judge has a duty to "play fast and loose with procedure for the greater good." It is a philosophy of kingship, not of law. When the leaders of the "union" teach this doctrine, it is no surprise when the "rank and file" follow it. The events in this case were not an aberration; they were the direct and foreseeable result of an institutional culture that has taught its members that they are above the law.

The next section is from Appellant's 2012 cert petition, _____, overtly alleging a secret docket system in the Second Circuit. R. 15.2 of the Supreme Court provides:

> "In addition to presenting other arguments for denying the petition, the brief in opposition *should address any perceived misstatement of fact or law in the petition* that bears on what issues properly would be before the Court if certiorari were granted. Counsel are *admonished that they have an obligation to the Court to point out in the brief in opposition, and not later, any perceived misstatement made in the petition*."

The Solicitor General has a place of special duty of candor to that Court, heightened duties. So, as briefed by Lerner, ____, and so adopted here, while the Committee sanctioned us for making untrue, derogatory statements about Judges Cogan, Glaser, regarding the presence of just such a secret docket system, it is conclusory, never mind indicative, that it is highly likely that the Committee knew that our allegations were true, and misrepresented that, or in any event was at least trying to prevent our establishing the truth for reasons including maintaining a false and defamatory narrative about *us*. And certainly there cannot be a better confirmation that that there was actual bias, and conflict, than that the Solicitor General knew better than to lie and say this wasn't so speaks for itself; beginning on page ___ of that petition:

> The integrity of the federal court system depends on this Court's confirming that a covert dual justice system of secret criminal trials is illegal and can have no place in American law. Secret criminal courts are illegal. In particular they work fraud on victims...

> Counsel have not cited and we have been unable to find a single instance of a criminal trial conducted *in camera* in any federal, state, or municipal court during the history of this country. Nor have we found any record of even one such secret criminal trial in England since abolition of the Court of Star Chamber in 1641, and whether that court ever convicted people secretly is in dispute. - *In Re Oliver*, 333 U.S. 257, 266 (1948)

> They should have looked in New York. In thirty years since *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980), this Court repeatedly affirmed First Amendment rights of access to criminal proceedings; at the same time, Second Circuit courts, at least Eastern and Southern districts, have operated in egregious defiance of it.

In 1982, The New York Times described a system of secret justice prevalent in the S.D.N.Y., of hidden guilty pleas, and, often, hidden sentencings for cooperators″. An ensuing GAO audit found the problem present nationwide, but 50 times as frequent in New York. Washington may be, now, a close second. Interestingly, the U.S. Attorney at the time denied this was for cooperators′ safety, insisting it was for the convenience of the government, so their identity would remain secret. No one asked how he thought that might work out for the victims. One might say that he operated before victims′ rights were elevated, before the first such statute, the Victim Witness Protection Act, took effect in 1983, but long before the VWPA, courts could order restitution as condition of probation  two things may be concluded, (1) few if any who got these secret convictions were incarcerated, as that would make the secret hard to keep; and (2) few if any had restitution imposed as a condition, as that too would expose the secret.Lord Acton observed, ″Everything secret degenerates, even the administration of justice,″ a value similar to that expressed in colonial charters…

Now, as this case illustrates, the problem is at scandal level, and the damage done to victims is incalculable. And we are all victims when the integrity of the federal justice system degenerates. And only this Court can stop it…

And make no mistake -- In the shadow justice system, hidden justice *is* for sale, admission *paid* in the currency of cooperation. Most of these hidden cases are those of cooperators. Petitioner makes no argument that cooperation and plea bargaining are, or ought to be, unconstitutional or illegal; those are matters of politics, of executive discretion, not relevant here.

But when the government crosses the line into illegality and the courts don′t stop it, when sealing orders work injustice to crime victims and embolden the criminal defendant to continue on his path of crime, attention must be paid. Notice must be taken.

For example, in respondent Sater's case, though his stock swindles ran from 1994 through 1996, pursuant to 18 U.S.C. § 1964(d) his victims were precluded from suing him in civil RICO until he was sentenced in October 2009, when a four-year statute of limitations first began to run.

In other words, they can still sue him now. 18 U.S.C. § 1506, App. 3a, makes it an obstruction of justice to conceal a federal court judgment in such manner that it does not take proper and full effect. It has been in force since 1790. Yet petitioner is barred from taking steps to reveal this, that would give effect to the secret final judgment of conviction rendered against respondent Sater. And the courts below, Sater, and the government are preventing the judgment from taking effect.

For example, if Sater had been ordered as part of his sentence to pay to victims restitution, as the law required that the district court do, 18 U.S.C § 3663A, App. 6a, they would be able to use the order to obtain summary judgment of civil RICO liability, 18 USC § 3664(1).

How does a district court justify refusing to comply with provisions of mandatory sentencing law? It doesn't. It can't. This Court so held, unanimously, in *Ex Parte United States*, 242 U.S. 27 (1916): When federal courts refuse to impose a mandatory sentence it violates the law and operates *illegally*. If there were any doubt that this applies to a mandatory sentence of restitution, this Court put that to rest in *Dolan v. United States*, 103 S.Ct. 2553 (2010), noting that when Congress wrote in the mandatory restitution statute that such an order must be imposed at sentencing *notwithstanding any other* provision of law, 18 U.S.C. § 3663A, Congress meant what it said. What about cooperator safety? Every filing by respondent Sater and the government solemnly intones that warning, arguing that the courts must hide all this to keep Sater safe. To which the reply must be, where in Article III are the federal courts vested with police powers?

*Ex Parte United States* say, "Nowhere." Humanitarian consideration (health and safety of the defendant) cannot justify a court's defiance of the law, making it clear: there is never lawful basis for a court to refuse to obey mandatory sentencing law. All courts in the country were theren required to comply with mandatory sentencing laws. 4500 defendants throughout the country faced sentencing they thought had been delayed indefinitely after this Court ruled in *Ex Parte United States*.

And what about current victims, not of the underlying crime, but of its concealment? As the courts below well know from all the submissions, respondent has been a principal at a New York real estate developer, its

former Chief Operating Officer and managing director from about 2002 through 2008. JA 298. Even without the submissions the judiciary would have to know, because during that time respondent was under a cooperation agreement and Probation Office knew what he was doing.

It is black letter law that when a principal conceals a fraud conviction from his partners and investors, to whom he owes fiduciary duties of self-disclosure, that is constructive fraud. Respondent Saterhas been doing that since he pled guilty in 1998. The courts below must know he has been emboldened to continue his frauds, if for no other reason than that his Probation Officer acknowledged in the 2004 PSR that Doe′s racketeering conviction was being hidden from the firm and his partners, including petitioner′s clients. The firm′s investors, lenders, and insurers have been and continue to be defrauded by this concealment, as petitioner alleged in the civil RICO complaint. That complaint has been languishing under seal for years because the courts wish to "protect Sater's safety," even though, as argued *infra,* no one has ever produced any evidence that there′s even any risk.

Back to the original victims. *Dolan* strongly suggests this Court would hold that sentencing respondent today to that long overdue restitution order would not violate due process. With interest or loss of use, that should be about a $ 200,000,000 restitution order by now. If that is the case, then every day that the District Court refuses to do so, it violates the law. *Ex Parte United States.*

Finally, how many other defendants have hidden felony convictions? How many licensed professionals are unlawfully maintaining their licenses by failing to disclose a conviction they know is hidden? How many schoolteachers are hiding federal convictions? Doctors? Why is petitioner enjoined from revealing that Sater pled guilty to RICO, and was finally sentenced in October 2009? The reasons for granting this writ are that there myriad victims, and they are us…

A criminal trial comes into existence with at least one aspect, even if merely its existence, presumptively open. By this Court′s precedent, any portion of that trial which is presumptively open at inception can only be closed upon the court′s finding that one of two tests have been satisfied, a *compelling interest* test or a *countervailing interest* test.

By definition, it can never be a compelling or countervailing interest to a presumption of openness (or to anything else) for a court to seek to operate in violation of the law. No court has a constitutionally cognizable interest in operating illegally, without authority, and so no court has a constitutionally cognizable interest in sealing anything such that to do so would bring about an illegal result.

Direct Illegality I. As noted, in *Ex Parte United States*, 242 U.S. 27 (1916), this Court held, unanimously, that a court that fails to follow mandatory sentencing laws violates the separation of powers and acts illegally, specifically stating that even considerations of humanity (*e.g.,* the health and safety of a defendant) would not justify a failure to sentence according to law. 242 U.S. at 51.

The obligation to impose a sentence of mandatory restitution, 18 U.S.C. § 3663A, is a part of mandatory sentencing law, indeed itself states that the order shall be imposed notwithstanding any other law. *Dolan, supra.* Therefore, no order, whether imposed upon satisfaction of a compelling interest or countervailing interest test, which results in a frustration, avoidance, evasion, derogation, or other failure to comply with those laws can be legal.

Whether, and if so to what degree, *Ex Parte United States* applies to other mandatory provisions of sentencing law is to be developed. For example, 18 U.S.C § 3553(c) facially requires a statement of reasons be read aloud in open court as part of sentencing. Presumably *Ex Parte United States* is not limited to substantive statutes. Petitioner submits that where Congress has spoken, even if procedurally, in areas which this Court has determined are within Congressional authority to control, by separation of powers sealing may not legally override it.

**Direct Illegality II.** Nothing in *United States* is married to sentencing law; its logic should apply to anything where Congress constitutionally restricted what a Court might otherwise have the authority to do. For example, as noted, in 1790 (one year after All Writs, thus superseding it in the event of any conflict), Congress passed the forerunner to 18 U.S.C. § 1506, App. 3a, which makes it illegal to "take away" or "avoid" any federal court record with the result that a judgment not take effect.

With respect to those rights to whomsoever applying created by Congress for which final conviction is a condition precedent, no order that frustrates fulfillment of those rights can be legal. The issue is not whether § 1506 creates a private right of action for a judicial taking in a situation like the underlying case where the right to sue respondent in civil RICO based on his RICO securities fraud came into existence only upon his final conviction and entry of judgment but is being concealed from his victims; the issue is that it cannot be legal to conceal it…

.

## VI.    HISTORICAL-PHILOSOPHICAL ROOTS OF THE CRISIS

### A.    THE EMERGENCE OF A PATHOCRACY: MONSTERS FROM THE ID (CONT'D…)

**Systemic Consequences: The Market for Bad Legal Advice and Thefts of Rights** This institutional pathology has devastating real-world consequences, creating what Professor William Simon calls a "market for bad legal advice" and resulting in what you have termed *geneivat da'at*—the theft of mind and awareness.

The secret docket system is not a passive concealment; it is an active mechanism for fraud. By hiding criminal proceedings, it serves two illicit purposes:

- ➤ *It sells a clean public record to the cooperator*. A defendant like Sater, despite a conviction for a massive fraud, has no publicly searchable criminal record, allowing him to operate in the business world under false pretenses.

- ➤ *It defrauds victims of their statutory rights*. By ensuring victims are never notified of the proceedings, the system makes it impossible for them to claim their rights to restitution under the **Mandatory Victims Restitution Act (MVRA)** and the **Crime Victims' Rights Act (CVRA)**. This was confirmed by an alleged on-the-record admission from an EDNY AUSA in November 2011, who stated it was the office's practice not to inform victims in cooperating witness cases.

This constitutes a massive, unconstitutional "taking" of property by the government. The victims' statutory rights to restitution are extinguished for the "public use" of securing a cooperator's assistance. Appellant's lawsuit in the Court

of Federal Claims for the ***$8 billion in wealth transferred from victims to thieves*** by this design is a direct attempt to hold the government accountable for the financial consequences of this systemic fraud.

The evidence in this case no longer points, if it ever did, to a mere abuse of power, but to a coordinated, multi-layered fabrication of fact and law by the District Court, the United States Attorney's Office, and the United States Court of Appeals for the Second Circuit.

It reveals a system that, when threatened, will abandon rule of law to protect itself, weaponizing secrecy and creating fictions to punish those who expose the truth. More than a constitutional crisis in miniature; it is evidence of a functioning pathocracy that has weaponized the judicial process itself. The appellate remedies sought—***vacatur ab initio for fraud on the court and intolerable likelihood of bias***—are not about correcting a single case, but about beginning the necessary, urgent work of confronting the "monsters" that have emerged from within the system itself.

### B.     PART V: A FLAW IN THE CONSTITUTIONAL DESIGN? THE CRISIS OF JUDICIAL ACCOUNTABILITY

This case study, with its interlocking layers of statutory violation, constitutional failure, and systemic deception, ultimately forces a confrontation with one of the most profound and unsettling questions of American governance: *Quis custodiet ipsos custodes?*—Who will guard the guardians themselves? The sequence of events surrounding the *Sater* secrecy and the Appellant contempt order reveals a critical vulnerability in the Constitution's elegant architecture of separated powers. The system of checks and balances, as designed, is predicated on the assumption that the judiciary, while not infallible, will operate largely in good faith within the bounds of the law. The system is designed to correct legal *errors* through the process of appellate review and to punish egregious individual *corruption* through the political mechanism of impeachment. It has no effective, routine mechanism to counter *systemic, institutional misconduct*, especially when that misconduct is carried out in collusion with the executive branch and shielded by powerful doctrines of judicial immunity and secrecy.

This case exposes the limits of the traditional checks. Appellate review, the primary check on lower court error, can fail when the culture of secrecy is pervasive. If the initial act of "phantom sealing" hides the very existence of a case from public and appellate scrutiny, there is nothing to review. Furthermore, when the appellate courts themselves are part of the same institutional culture, they may be disinclined to rigorously police the procedural shortcuts of their colleagues, particularly when powerful national security interests are invoked by the executive branch.

Impeachment, the Constitution's ultimate remedy for judicial malfeasance, is a political tool too blunt, too cumbersome, and too impractical to address this kind of deep-seated procedural corruption. The impeachment of Judge Peck in 1831 was a rare and momentous event, triggered by a single, publicly visible act of tyranny.[1] It is ill-suited to address a widespread, low-visibility practice like "phantom sealing," which is more akin to a systemic administrative disease than a singular dramatic crime. For impeachment to be a viable check, the misconduct must be so egregious and so politically unpalatable that it can capture the sustained attention of Congress. Systemic procedural violations, hidden within the arcane workings of the court system, rarely meet that threshold.[1]

This reveals the fundamental flaw: the Constitution provides no clear answer when the judiciary, as an institution, chooses to disregard the statutory limits placed upon it by Congress, and when it does so in partnership with the executive branch. When the judiciary can effectively nullify a statute like the 1831 Contempt Act by re-asserting a nebulous "inherent power," the legislative check on the judiciary is broken. When the judiciary uses that power to enforce a secrecy pact with the executive, the check of public and press scrutiny is neutralized. What remains is a branch of government that has become the sole arbiter of its own power, accountable only to itself. The *Sater* case is a microcosm of this crisis. It demonstrates that when judicial and executive interests align to subvert the rule of law, the constitutional safeguards designed to prevent such abuses can be rendered inert, leaving a vacuum of accountability at the very heart of the constitutional order.

## VII.  CONCLUSION

Wherefore the above, Appellant prays this Court now order the vacatur *ab initio* of all decisions rendered by the Appellee below, ***with prejudice***, and such other relief, in law or equity, as this Court feels is due.

Montauk, New York
July 28, 2025

*Frederick M. Oberlander*

/s/ Frederick M. Oberlander, Esq.
43 West 43rd Street, Ste. 133
New York, NY 10036
646-901-1574
212-202-7624 Fax

# CERTIFICATE OF COMPLIANCE

**Type-Volume Limit, Typeface Requirements and Type-Style Requirements**:

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding  parts exempted by Fed. R. App. P. 32(f): this document contains no more than 11,900 words, and with various limit imposed by order of this court, wtih cross-adoption it contains no more than 39,000 words. It complies with the typeface requirements of Fed. S. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has has been prepared in 14-point Equity Tab A, a proportionally spaced serif typeface using Microsoft Word/Office 365.


Dated:

 Montauk, New York

 July 28, 2025

> Frederick M. Oberlander, Esq.
> *Pro Se Respondent-Appellant*