# 24-2974

# United States Court of Appeals for the Second Circuit

---

GRIEVANCE COMMITTEE OF THE
EASTERN DISTRICT OF NEW YORK,

*Petitioner-Appellee,*

v.

FREDERICK M. OBERLANDER

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR RESPONDENT-APPELLANT

FREDERICK M. OBERLANDER, ESQ.
THE LAW OFFICE OF FREDERICK M. OBERLANDER, P.C.
*Respondent-Appellant Pro Se*
43 West 43rd Street, Ste. 133
New York, New York
(646) 901-1574
fred55@aol.com

# I.    TABLE OF CONTENTS

I.    TABLE OF CONTENTS .......................................................... 1

II.   TABLE OF AUTHORITIES ..................................................... 4

III.  STATEMENT AS TO ORAL ARGUMENT ............................. 5

IV.   LERNER ADOPTION; STANDARD OF REVIEW; ISSUES; ............... 6

    A.    Adopt Co-Appellant Lerner's Complementary Appeal          6

    B.    Issues Present: *Caperton* Bias, Fraud on and by the Court    6

V.    PRELIMINARY STATEMENT ................................................ 7

    A.    This Isn't a Constitutional Crisis,  It's a *Constitutional Crime Scene* By This Court's Fraud and Responsibility  for Foreseeable Fraud on the US Supreme Court and US Court of Federal Claims    7

    B.    In General          8

    C.    This Court's Clear Duty to Rectify Its Fraudulent Judgments    8

VI.   ARGUMENT .................................................................... 11

    A.    Standard of Review is De Novo          11

    B.    Introduction          11

        i.    *The Foundational Crime—A Fraud of Ontology* ........................ 11

        ii.   *Institutional Cover-Up and Failure of Checks and Balances* ...... 12

        iii.  *The Cultural Pathology—A "Training Manual for Corruption"* .................................................................... 13

        iv.   *The Human Cost—Systematic Theft from 3,500 Victims* ........... 14

        v.    *Conclusion* ................................................................. 15

*vi.   Epimython* ...................................................................*15*

C.   **Fabricated Contempt Conviction**                          **16**

*i.   A Timeline of the Fabrication*......................................*16*

*ii.   Caperton Violation: Trial Judge's Fabrication* ............*19*

*iii.   Second Violation: Appellate Court's Ratification*...................... *20*

*iv.   Third Violation: Ex Parte Communications*................................*21*

*v.   The Committee's Duty Was to Reject Fraud, not Adopt It*........ *22*

D.   **When Appellee Grievance Committee of US District Court, ED, Composed of Judges from That Court, Sanctioned Appellate Attorney for statements critical of the EDNY the Committee Held Intemperate and False, It Violated Foundational Law**                          **23**

E.   **Solicitor General Admits What Committee Holds False**      **23**

F.   **Structural Due Process Violation in Attorney Discipline**      **28**

*i.   The Committee Was a Party-Adversary, not Neutral Arbiter*..... *28*

*ii.   The Collective Knowledge Doctrine Must Apply*...................... *29*

G.   **Constitutional Violation Under *Caperton***               **30**

*i.   The Solicitor General's Admission Is Conclusive Evidence* .......*31*

*ii.   This Was Structural Error So Requires Automatic Vacatur*........*31*

H.   **In Sum**                                              **32**

*i.   The Record Shows a Multi-Layered, Systemic Fabrication.* ...... *32*

*ii.   Constitutional Collapse*............................................... *35*

*iii.   Historical Precedent: A 170-Year-Old Institutional Habit* ......... *35*

*iv.   The Psychological Engine: "Monsters from the Id"* ................. *36*

v.   *Normalizingt Pathocracy: A Training Manual for Corruption*... 37

vi.  *Historical-Philosophical Crisis Roots: Emergence of a Pathocracy: Monsters from the Id (cont'd…)*............................ 38

vii. *Flaw in Constitutional Design, Crisis of Judicial Accountability* ....................................................................... 39

**VII. CONCLUSION AND RELIEF SOUGHT** ............................................. 42

## II.   TABLE OF AUTHORITIES

**Cases**

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238 (1944)......................................6

*United States v. Throckmorton*, 98 U.S. 61 (1878)..................................................................11

*Williams v. Pennsylvania*, 579 U.S. 1, 8–9 (2016).................................................................11

## III. STATEMENT AS TO ORAL ARGUMENT

Request for oral argument will be by motion.

## IV.  LERNER ADOPTION; STANDARD OF REVIEW; ISSUES;

### A.  ADOPT CO-APPELLANT LERNER'S COMPLEMENTARY APPEAL

Appeal is had from those aspects of all decisions of Appellee EDNY Grievance Committee which as *categorical structural* error require vacatur without consideration of harmlessness. Appellant incorporates by reference, adopting in full force and effect as if set forth herein, co-appellant Lerner's appellant's brief (ECF ____ 18-2782) of complementary errors analyzed for harmlessness to align to ensure comprehensive review. As categorical classification of error is incomplete[1], Appellant asks the Court align and resolve these appeals in interest of justice in case of any overlap.

### B.  ISSUES PRESENT: *CAPERTON* BIAS, FRAUD ON AND BY THE COURT

Issues are *Caperton*-**level judicial bias**, requiring recusal if apparent objective bias violates due process; (2) **Fraud on the Court**, *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238 (1944), recusal if deceit undermines judicial integrity.

The Court should note that such fraud can be derivative or constitutive, the first where the deciding court is receiving as "fruit of a poisonous tree" the fraud of another, earlier court, the second where the deciding court *is* the instrument of fraud. Both are implicated, but the latter category most applies, because it is epistemic fraud collapsing any pretense to a difference between error and ontology. *See infra.*

---

[1] Epistemic and computational incompleteness, is Godelian and Turing incomplete in sufficiently expressive systems (to make a record for further review, this can be formalized as a sheaf of epistemic failure whose local contradictions glue into a global, measure-equivalent manifold of systemic limits.)

## V. PRELIMINARY STATEMENT

### A. THIS ISN'T A CONSTITUTIONAL CRISIS, IT'S A *CONSTITUTIONAL CRIME SCENE* BY THIS COURT'S FRAUD AND RESPONSIBILITY FOR FORESEEABLE FRAUD ON THE US SUPREME COURT AND US COURT OF FEDERAL CLAIMS

The legitimacy of a judiciary rests on a predicate of *integrity*. When its records are not flawed, but ***fabricated***, crisis is existential. This case is about that ***uberfact***, determinable from the face of official record, so corrupting as to be constitutional poison, rendering null all process it touched: *A criminal contempt finding predicate to disciplinary action against Appellant was **fraud by fabrication**, juridical invention of whole cloth made nine months after the fact by an EDNY district court and laundered into legitimacy by this court to justify otherwise illegal prior restraint then given to the Solicitor General who used ti to defraud the Supreme Court. And this Court owns it all. **All of it**.*

This is taken from the Solicitor General's Opposition Brief (in Petition for Certiorari) in *ROE v. UNITED STATES*, which Appellant pursued from the Second Circuit's fraudulent decision discussed herein. It is reproduced in its entirety in _____ and is otherwise available at 2013 U.S. S. Ct. Briefs LEXIS 976.

> [T]he district court found Appellant obtained Sater's presentencing report from one of his clients who had wrongfully taken it. This Court never resolved if information was acquired unlawfully government may punish its ensuing publication. As the court found Appellant's client unlawfully obtained it and *Appellant knowingly and intentionally flouted a Court order in deciding the sealing order did not apply to him*, because it determined Appellant had not lawfully acquired the material, the court of appeals' decision does not conflict with this Court's precedent. Nor is it appropriate to address the question the Court has reserved. *That Appellant had knowingly violated a court order differentiates him from press who acquire material from sources acting independently.*

7

## B.   IN GENERAL

**Part One** provides the background information establishing that the quoted text, is Hazel-Atlas fraud falsely representing to the Supreme Court that the purported contempt finding purportedly supporting the injunction actually did or even could have happened, when once again DOJ had actual knowledge from its own contrary appellate brief filed in this Court in that matter was factual and legal impossibility, making this historic, clear fraud on the highest court in the land teeing up proof that the disciplinary proceeding is constitutional nullity as its predicate is such fraud.

*Part Two* will prove that even if this Court ignored that foundational fraud, the Committee's orders must be vacated because processes by which they were obtained in the surrounding circumstances demonstrate *Caperton*-level institutional bias so far extreme that none of its processes can at all be believed products of a neutral arbiter.

*Part Three* will prove the entire disciplinary proceeding a constitutional nullity because its predicate is a *Hazel-Atlas* fraud, and legal impossibility.

But why wait…

## C.   THIS COURT'S CLEAR DUTY TO RECTIFY ITS FRAUDULENT JUDGMENTS

"Fraud on the court" is not a procedural error but a direct assault on judicial integrity. When an appellate panel deliberately engineers a predetermined, non-juridically motivated outcome, it commits institutional fraud that subverts the core judicial function. The resulting judgment is void ab initio—a legal nullity. That is why ***fraud on the court has no statute of limitations***. At the district court level, while Rule

8

60(b)(3) imposes a one-year limit for ordinary fraud, Rule 60(d)(3) preserves unlimited power to "set aside a judgment for fraud on the court," deliberate legislative choice: judicial integrity supersedes finality when a court's own processes have been corrupted. The same is true at the appellate level whether by statute, for example All Writs, or by common law. Time cannot sanitize a fraudulent judgment of any court.

Even this one.

Federal courts' inherent powers flowing from Article III are those essential to their constitutional function. Chief among these is the power to vacate its own judgment on proof that a fraud has been perpetrated upon the court. This authority is not discretionary—it is fundamental to judicial self-preservation. It may well be that this power constitutes part of the "irreducible nucleus" of Article III power that Congress cannot abrogate, but in any event *a court, even this one, that knowingly allows its fraudulent decision to stand fails to exercise a power essential to its identity as an independent branch of government. This is institutional self-mutilation intolerable in any court.*

Even this one.

The normal tool for an appellate court to revisit a closed case is recalling its mandate, reasserting control to reconsider a decision, then vacating. Albeit reserved for exceptional circumstances, they include fraud and preventing manifest injustice. And again while in some cases subject to "reasonable time" standard, this is not so for fraud on the court, since the absence of a time limit for vacating such judgments necessarily makes rigid timeliness standards manifest injustice. If credible evidence of fraud is presented, all conditions for a court to recall a mandate are met *per se.*

Even this one.

Moreover, the Code of Conduct for United States Judges requires judges to:

➢ "Uphold the integrity and independence of the judiciary" (Canon 1)

➢ "Avoid impropriety and the appearance of impropriety" (Canon 2)

➢ "Perform duties fairly, impartially and diligently" (Canon 3)

These impose an *affirmative duty to act*. A court aware of credible evidence that fraud was perpetrated on or by it is ethically obligated to take action. *Inaction is not neutral, but ongoing breach making any court complicit in continuing effects of the fraud*.

Even this one.

The Supreme Court warned, "tampering with the administration of justice… cannot complacently be tolerated." For a court to learn its fraudulent decision is being used to perpetrate further injustice and do nothing is to be silent a partner in it.

***Even this one.***

The issuing appellate court faces a stark moral and legal imperative:

➢ **Judgment is void** - Fraud on a court renders nullity without time limitation

➢ **Power exists** - Inherent authority to vacate fraudulent judgment

➢ **Duty is clear** - Ethical obligations require action upon learning of fraud

➢ **Mechanism is available** Mandate recall for exceptional circumstances

➢ **Inaction is complicity** - Failure to act perpetuates and enables injustice

The only remedy is for the appellate court to *immediately recall its mandate and vacate the fraudulent judgment*, on motion or *sua sponte* as required, failure to do so is basis for recourse to Supreme Court. Courts must commit to justice more than to reluctance to confront failings. No institution, even a federal court, is above the law.

Even this one.

10

## VI.  ARGUMENT

### A.  STANDARD OF REVIEW IS DE NOVO

Review is *de novo* as to all questions of law and fact, given the structural and constitutional character of the claims raised.[2]

### B.  INTRODUCTION

### i.  The Foundational Crime—A Fraud of Ontology

The entire disciplinary proceeding is built upon a predicate that is a legal and factual impossibility: a criminal contempt finding that was retroactively fabricated. This was not the mere backdating of a real event, but the creation of a counterfeit one—an act of ontological fraud and, frankly, vastly more serious. *Epimythia, infra*.

**The Legal Impossibility**: Under Fed. R. Crim. P. 42, a criminal contempt finding cannot be unrecorded. The rule provides only two paths for such a finding, both mandating creation of a dispositive, reviewable record (either a signed certification for direct contempt or a full record for indirect contempt).1 The complete absence of such a record from the 2010 proceedings is definitive legal proof that no contempt finding occurred. The "empty record is the definitive legal answer".

---

[2] *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009) (objective risk of bias is structural error mandating *de novo* review); *Williams v. Pennsylvania*, 579 U.S. 1, 8–9 (2016) (same actor as accuser and adjudicator violates Due Process so structural not subject to harmless-error). More generally, *United States v. Throckmorton*, 98 U.S. 61 (1878) **(**Intrinsic fraud (issues already litigated) is not ground to reopen a judgment, but *extrinsic fraud* that prevents proper adjudication thus necessarily fraud on the court as well definitionally *prevents a real record from forming*, legitimacy of the prior judgment void *ab initio*, later reviewing court cannot defer to findings rest on tainted proceedings, a *false ontology* which precludes deference to factual findings or legal conclusions where the findings and conclusions themselves are alleged to be fabricated or derived from judicial participation in their own taint).

11

**A Non-Judicial Act**: The distinction between backdating a real order and inventing a non-existent one is critical. Backdating, while corrupt, is a perversion of a legitimate judicial function. Fabricating a conviction that never happened, however, is not a judicial function at all. It is an act of forgery, akin to planting false evidence in a file. The judge is not acting as judge, but a person creating a counterfeit judicial artifact to achieve a punitive outcome.1 This foundational crime falls entirely outside the scope of judicial authority and poisons every subsequent proceeding.

ii.     **Institutional Cover-Up and Failure of Checks and Balances**

The initial fabrication was protected and legitimized by this (appellate) court and now the Grievance Committee, demonstrating a catastrophic failure of the system's internal checks and balances.

**Laundering the Lie**: The appellate court, faced with an order based on a non-existent predicate, engaged in a two-stage process to launder fiction into fact. First, it used *linguistic laundering,* stating the later order merely "*reflected*" the prior, non-existent finding, a self-referential loop affirming narrative without affirming reality. Second, it used *procedural obfuscation*, misapplying an inapplicable deferential abuse of discretion standard of review to a fact absent from the record, a profoundly clear act of willful blindness designed to shield the fabrication from scrutiny.

**Structural Bias and *Caperton* Violation:** Appellee Grievance Committee, composed of judges from the very court being criticized, was structurally incapable of providing a fair tribunal. This arrangement violates the ancient maxim of *nemo judex in causa sua* (no one shall be a judge in his own cause). This structural defect

12

created a "serious risk of actual bias" that is unconstitutional under the objective standard set by *Caperton*. The risk is not merely theoretical; it was actualized when the Committee declared Appellant's statements false despite the Solicitor General's legally imputed admission of their truth:

**The Solicitor General's Tacit Admission:** A key piece of evidence is the Solicitor General's failure to rebut Dr. Oberlander's allegations of a "covert dual justice system" in a 2012 Supreme Court filing. Under Supreme Court Rule 15.2, counsel has a mandatory "obligation to the Court to point out... any perceived misstatement of fact". The SG's silence, given the office's heightened duty of candor, functions as a powerful imputed admission by the Executive and is irreconcilable constitutional contradiction: the Judiciary punished a citizen for stating a fact that the Executive Branch would not deny before the nation's highest court. ECF _____.

### iii.    The Cultural Pathology—A "Training Manual for Corruption"

The fabrication was not an anomaly but the product of a judicial culture that has normalized procedural deception. A January 2000 panel discussion at Brooklyn Law School, published in the Journal of Law and Policy, serves as a "training manual" for this culture, where senior federal judges openly discussed a toolkit of "performance art" used to achieve desired outcomes, particularly in cases involving cooperating witnesses. *See PANEL 4_ Secrecy and the Courts_ The Judges Perspective*

**The Tool**kit of Deception: The judges discussed setting "sham trial dates" to mask a defendant's cooperation, with one judge admitting to engaging in such a "charade".1 They debated pronouncing a misleading sentence in open court to protect an

13

informant, with one judge defending the practice in a rare scenario, stating, "I am not troubled that Judge Martin would do such a thing".1

The "Empty Courtroom" Technique: The most telling example was the explanation of how to bypass the First Amendment's requirement of an open courtroom. A judge described scheduling a plea "at the end of the day when there is no one there," a technique designed to "moot out" the public's right of access while maintaining a veneer of technical compliance.

This transcript reveals a mindset where constitutional principles are not inviolable commands but inconvenient obstacles to be managed through procedural gamesmanship. It is the cultural soil in which an act of outright fabrication could be conceived and protected.

### iv. The Human Cost—Systematic Theft from 3,500 Victims

This "covert dual justice system" is not an abstract constitutional flaw; it is an engine of massive, tangible harm. By hiding criminal proceedings, the system makes it impossible for victims to be notified and claim their statutory rights to restitution under the Mandatory Victims Restitution Act (MVRA) and the Crime Victims' Rights Act (CVRA). This constitutes a massive, unconstitutional "taking" of property, where victims' rights are extinguished for the "public use" of securing a cooperator's assistance. The class action lawsuit you have filed in the Court of Federal Claims, implicating *$8 billion in damages on behalf of 3,500 victims over 20 years,* gives

the staggering, real-world scale of this institutional practice. It proves that the procedural fabrications are the indispensable legal machinery for a multi-billion dollar fraud perpetrated against the public.

### v.     Conclusion

The evidence, when synthesized, portrays a system that has become untethered from its foundational commitment to objective reality. The fabrication of a legal fact ⸴; its institutional ratification through linguistic and procedural evasion ⸴; the underlying judicial culture that normalizes deception ⸴; the doctrinal impulse to punish truthful criticism; and the devastating financial harm to thousands of victims all point to a system that has prioritized its own secrecy and prestige over the rule of law.

This is the "Constitutional Crime Scene" this brief describes.

### vi.     Epimythion

Oedipus thinks he's in control, finding the killer of Laius in belief that truth is something external he can see with reason. But a messenger says something too close, timed too well, and Oedipus' assumptions unravel as the world he thought he was in collapses: t*he story was not about an external mystery, but about him. He was inside it all along, digging his grave, believing he was getting closer to truth when truth was getting closer to him*. The Greeks called that insight **anagnorisis**, and might have said, if seeing too much too soon kills as well a bullet; seeing too little too late can, too. Here we deal with a cousin **kairognorisis**, insight that comes in the knick of time…maybe.

15

### C.    FABRICATED CONTEMPT CONVICTION

### i.    A Timeline of the Fabrication

The factual predicate of this case is not a linear series of events, but a timeline of escalating contradictions, where official court findings are directly refuted by on-the-record statements and documentary evidence.

- **2004: The Public Record.** The case file for *U.S. v. Felix Sater* (98-cr-1101) is transferred to the National Archives and Records Administration (NARA) in an unsealed box and *is made publicly available. This status as a public record is later confirmed by NARA itself.*

- **June 14, 2010: The First Admission.** In a hearing transcript, Judge I. Leo Glasser states unequivocally that no order was ever directed at Appellant: **"So when your letter asks me to show you what order is directed to Mr. Ober-lander, there isn't any."** ECF____at____.

- **June 21, 2010: The Second Admission.** Judge Glasser clarifies his injunction against the dissemination of Sater's Presentence Report is *in rem* (against the document), not *in personam* (against Appellant). He explicitly says Appellant's knowledge or alleged wrongdoing is irrelevant to his injunction, and is unsure he has authority to enforce a sealing order on a non-party. ECF____at____

- **July 21, 2010: The Second Admission.** Judge Glasser notes his confusion and uncertainty whether (1) the mere presence of the flap on an envelope is an order that can be enforced on a non-party; notes his uncertainty whether a

16

third party is bound by a docket notation of "sealed," clarifies his injunction against the dissemination of Sater's Presentence Report is *in rem* (against the document), not *in personam* (against Appellant). He explicitly says Appellant's knowledge or alleged wrongdoing is irrelevant to his injunction, and is unsure he has authority to enforce a sealing order on a non-party. ECF____at____

➤ **February 2011: The Prosecutor's Admission.** AUSA Todd Kaminsky writes to the Second Circuit, stating there is no evidence of any risk to Sater, and the government can no longer ethically pretend there is. ECF____at____.

➤ **March 23, 2011: The "Presumed Order" and Contempt Finding.** In direct reversal, Judge Glasser issues a written order finding Appellant in criminal contempt. He bases this on violation of a "presumed order" that he concludes "must be presumed... to have existed," in part because of the "danger to the life of John Doe." This finding is made *sua sponte*, without the notice, hearing, or any of the due process required by Federal Rule of Criminal Procedure 42. However, he makes clear that this is not actually *the* finding, because he says that at least the June 21, 2021 injunction was based on it. This Court agrees and refers to this order as "reflecting" the finding, not making it. And in any event he makes clear that it is based on the concept that the notation "sealed" on a docket it is a global prior restraint, making it ridiculous to say that he had decided that as of July 20, 2021, when he was still debating the point with Counsel and Co-Appellant Lerner, *supra*. ECF____at____.

17

➢ **April 11, 2011: The Government Confirms Appellant's Statement and in dong so disavows this Court itself when it filed its brief in the CA2 case and noted therein that on June 21, 2010, while issuing the injunction on the PSR Judge Glasser expressed serious doubt whether he could enforce a sealing order against a non-party, and asked for briefing, making it quite impossible that he had, according to this Court's version of history,** *infra***, already held Appellant in contempt of the sealing order as this Court would have one believe.** See pgs. 43-44. ECF 179, 10-2905 CA2.

➢ **April 27, 2011: The Fourth Admission.** In an *ex parte* transcript, Judge Glasser explains his contempt order by *admitting he had no knowledge a sealing order ever existed when he made his prior statements.* He states: **"I had no knowledge it ever existed which is why I made that statement on the record at one point. I couldn't find any order directing that anything be sealed."** He explains the sealing must have happened via a verbal "so ordered" on an unremembered date, documented on a "day sheet" he had never seen before the prosecution recently found it.

➢ **June 29, 2011: The Appellate "Laundering of the Lie".** This Court issues an order affirming the 2010 injunction. This order claims that on June 21, 2010, Judge Glasser had based his injunction on "his finding that [appellant] had contemned his sealing order" and on the "physical danger to Doe." ***This appellate finding is directly contradicted by the transcript from that day, in***

18

*which the judge expressed doubt about his authority to enforce a sealing order against a non-party and stated the appellant's conduct was irrelevant.*

➤ **March 27, 2013: The "Sent in Error" E-mail.** After the Solicitor General serves Appellant a secret *ex parte* order from Judge Glasser, AUSA Kaminsky demands return by email: **"this document was sent to you in error by the Solicitor General and not intended to be viewed by you."** *This order, acknowledges Sater's sentencing took place in open court, obliterating any justification for ongoing injunctions against Appellant.* ECF____at____

This timeline establishes the foundational reality: the entire legal proceeding was built upon a "sealed case" that was public record and a "violated order" that the judge admitted did not exist. The subsequent contempt finding and appellate affirmation were retroactive fabrications designed to conceal this reality.

### ii.    Caperton Violation: Trial Judge's Fabrication

**Objective Fact**: The district judge issued a punitive order against Appellant, citing a prior finding of contempt that does not exist in the record. which contains no such finding. Unrecorded criminal contempt findings are legal impossibility under the Federal Rules of Criminal Procedure 42, requiring elaborate, public due process. The complete absence of a Rule 42(b) certification or any record of a Rule 42(a) proceeding from the complete record of the 2010 hearings is, therefore, dispositive proof that no legally cognizable "finding of contempt" occurred. The empty record is the definitive legal answer.

**Caperton Analysis:**

➤ **Objective Test Met**: A judge who invents a legal event to justify punishment presents dispositive evidence of unconstitutional bias. No inquiry into subjective motives needed.

➤ **Beyond Temptation**: The judge didn't succumb to temptation, he abandoned impartiality constructing reality to fit predetermined outcome.

➤ **Manifest Bias**: Fabricating a predicate fact is not an "appearance" of bias—it is objective proof of it. The act itself demonstrates the judge was "psychologically wedded to a pre-determined disposition."

The fabricated contempt finding created unconstitutional probability of bias requiring recusal. Failure to recuse and issuance of the order violated due process.

### iii.    Second Violation: Appellate Court's Ratification

**Objective Fact**: The appellate court was presented with a punitive order and record proving its factual predicate didn't exist. Instead of reversing, it affirmed by (1) using the word "reflected" to describe the relationship between the order and the non-existent finding, and (2) applying "abuse of discretion" review to a fact not in the record let alone to a prior restraint for which there is no doubt *de novo* review applies.

**Caperton Analysis:**

➤ **Non-Adjudication**: The panel engaged in linguistic contortions to avoid confronting the record's silence—objective evidence it was protecting the lower court rather than conducting impartial review.

➢ **Systemic Temptation**: The panel put lower court authority over reality and rights, systemic harmony outweighing its duty of impartial review.

➢ **Systemic Bias**: A reasonable observer would see "serious risk of actual bias"—not personal, but systemic: bias toward affirming judicial decisions even when based on demonstrable falsehood.

### iv. Third Violation: Ex Parte Communications

Shortly after issuing the fraudulent March 23, 2011, "finding" or whatever it was supposed to be, Judge Glasser convened an ex parte conference to the deliberate exclusion of Appellants. In this he discussed these various points of concern:

**Conspiracy to Violate Due Process:** The statement that they will all exclude Appellant Lerner is on-the-record agreement to conduct secret, *ex parte* proceedings and to deliberately conceal them from you and your counsel. This is a profound and fundamental violation of the right to be heard and the right to an adversarial process. ECF____ at____

**Intent to Falsify a Judicial Record:** While plausible it could be somehow justified, the discussion of keeping things off the docket is, objectively, most likely a direct statement of intent to create a secret, parallel justice system. It is the very definition of the "phantom sealing" you have been alleging. It is a confession, in the judge's own words, of a plan to create a fraudulent and incomplete public record. ECF____ at____.

21

**Revealing Corrupt, Retaliatory Motive:** The justification: "as his (Lerner's) motives are questionable" is the ultimate proof of bad faith. The judge is not citing a law, a rule, or a valid security concern. He is citing his personal, subjective animosity toward a lawyer's *motives*. Why were the motives questionable? Because, as the judge admitted just pages earlier, all they did was find errors in what he did. ECF____at__

**The Rage:** Appellant, through counsel, objected to the March 23, 2011, "finding" and thus effectively (because it wasn't clear it was an order for FRCP purposes) sought its reconsideration. Rather than respond, rather bizarre since the order was of course entirely ex parte in the first place, the judge did nothing but complain that Appellant would criticize him. This is the evidence that makes the Caperton argument unassailable. It moves the analysis beyond a "probability of bias" and into the realm of direct, on-the-record proof of a judge who was so "personally embroiled" that he actively conspired with the government to subvert the Constitution to punish a critic. This is not just another piece of evidence for another filing. This is the proof of the conspiracy. This is not mere error but objective proof the system was incapable of providing the fair and impartial tribunal the Constitution demands. The probability of bias at both levels is "too high to be constitutionally tolerable," in fact is direct admission of retaliatory motive, a concession that our objections had merit, and so makes Caperton level probability of bias irrefutable. ECF____at____

### v. The Committee's Duty Was to Reject Fraud, not Adopt It

*The Committee was presented with this toxic and fraudulent predicate. Good-faith investigation would have revealed the contradictions in the record. Instead, the Committee*

*adopted the lie wholesale, becoming a co-conspirator in ongoing fraud. By predicating its disciplinary action on a non-existent contempt finding, its proceeding is rendered a nullity. The only proper constitutional remedy is to vacate it entirely.*

### D. WHEN APPELLEE GRIEVANCE COMMITTEE OF US DISTRICT COURT, ED, COMPOSED OF JUDGES FROM THAT COURT, SANCTIONED APPELLATE ATTORNEY FOR STATEMENTS CRITICAL OF THE EDNY THE COMMITTEE HELD INTEMPERATE AND FALSE, IT VIOLATED FOUNDATIONAL LAW

### E. SOLICITOR GENERAL ADMITS WHAT COMMITTEE HOLDS FALSE

This references Appellant's 2012 cert petition, *see_____* overtly alleging a secret docket system in the Second Circuit. R. 15.2 of the Supreme Court provides:

> "In addition to presenting other arguments for denying the petition, the brief in opposition ***should address any perceived misstatement of fact or law in the petition*** that bears on what issues properly would be before the Court if certiorari were granted. Counsel are ***admonished that they have an obligation to the Court to point out in the brief in opposition, and not later, any perceived misstatement made in the petition.***"

The Solicitor General has a special duty of candor to that Court, heightened duties. So, while the Committee sanctioned us for untrue, derogatory statements about Judges Cogan and Glaser, regarding the presence of just such a secret docket system, it is definitive, never mind indicative, that it is highly likely the Committee knew our allegations were true, and misrepresented that, or in any event at least tried to prevent our establishing the truth for reasons including maintaining a false and defamatory narrative about *us*. Certainly, that there is no better confirmation that there was actual bias and conflict than that the Solicitor General knew better than to lie and say this wasn't so speaks for itself; *see 2013 U.S. S. Ct. Briefs LEXIS infra*.

23

The integrity of the federal court system depends on this Court's confirming that a covert dual justice system of secret criminal trials is illegal and can have no place in American law. Secret criminal courts are illegal. In particular they work fraud on victims…

> Counsel have not cited and we have been unable to find a single instance of a criminal trial conducted *in camera* in any federal, state, or municipal court during the history of this country. Nor have we found any record of even one such secret criminal trial in England since abolition of the Court of Star Chamber in 1641, and whether that court ever convicted people secretly is in dispute. - *In Re Oliver*, 333 U.S. 257, 266 (1948)

They should have looked in New York. In thirty years since *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980), this Court repeatedly affirmed First Amendment rights of access to criminal proceedings; at the same time, Second Circuit courts, at least Eastern and Southern districts, have operated in egregious defiance of it.

In 1982, The New York Times described a system of secret justice prevalent in the S.D.N.Y., of hidden guilty pleas, and, often, hidden sentencings for cooperators". An ensuing GAO audit found the problem present nationwide, but 50 times as frequent in New York. Washington may be, now, a close second. Interestingly, the U.S. Attorney at the time denied this was for cooperators' safety, insisting it was for the convenience of the government, so their identity would remain secret. No one asked how he thought that might work out for the victims. One might say that he operated before victims' rights were elevated, before the first such statute, the Victim Witness Protection Act, took effect in 1983, but long before the VWPA, courts could order restitution as condition of probation  two things may be concluded, (1) few if any who got these secret convictions were incarcerated, as that would make the secret hard to keep; and (2) few if any had restitution imposed as a condition, as that too would expose the secret. Lord Acton observed, "Everything secret degenerates, even the administration of justice," a value similar to that expressed in colonial charters…

Now, as this case illustrates, the problem is at scandal level, and the damage done to victims is incalculable. And we are all victims when the integrity of the federal justice system degenerates. And only this Court can stop it…

And make no mistake -- In the shadow justice system, hidden justice *is* for sale, admission *paid* in the currency of cooperation. Most of these hidden cases are those of cooperators. Petitioner makes no argument that cooperation and plea bargaining are, or ought to be, unconstitutional or illegal; those are matters of politics, of executive discretion, not relevant here.

But when the government crosses the line into illegality and the courts don't stop it, when sealing orders work injustice to crime victims and embolden the criminal defendant to continue on his path of crime, attention must be paid. Notice must be taken.

For example, in respondent Sater's case, though his stock swindles ran from 1994 through 1996, pursuant to 18 U.S.C. § 1964(d) his victims were precluded from suing him in civil RICO until he was sentenced in October 2009, when a four-year statute of limitations first began to run. In other words, they can still sue him now. 18 U.S.C. § 1506, App. 3a, makes it an obstruction of justice to conceal a federal court judgment in such manner that it does not take proper and full effect. It has been in force since 1790. Yet petitioner is barred from taking steps to reveal this, that would give effect to the secret final judgment of conviction rendered against respondent Sater. And the courts below, Sater, and the government are preventing the judgment from taking effect.

For example, if Sater had been ordered as part of his sentence to pay to victims restitution, as the law required that the district court do, 18 U.S.C § 3663A, App. 6a, they would be able to use the order to obtain summary judgment of civil RICO liability, 18 USC § 3664(1).

How does a district court justify refusing to comply with provisions of mandatory sentencing law? It doesn't. It can't. This Court so held, unanimously, in *Ex Parte United States*, 242 U.S. 27 (1916): When federal courts refuse to impose a mandatory sentence it violates the law and operates *illegally*. If there were any doubt that this applies to a mandatory sentence of restitution, this Court put that to rest in *Dolan v. United States*, 103 S. Ct. 2553 (2010), noting that when Congress wrote in the mandatory restitution statute that such an order must be imposed at sentencing *notwithstanding any other* provision of law, 18 U.S.C. § 3663A, Congress meant what it said. What about cooperator safety? Every filing by respondent Sater and the government solemnly intones that warning, arguing that the courts must hide all this to keep Sater safe. To which the reply must be, where in Article III are the federal courts vested with police powers?

25

*Ex Parte United States* say, "Nowhere." Humanitarian consideration (health and safety of the defendant) cannot justify a court's defiance of the law, making it clear: there is never lawful basis for a court to refuse to obey mandatory sentencing law. All courts in the country were therein required to comply with mandatory sentencing laws. 4500 defendants throughout the country faced sentencing they thought had been delayed indefinitely after this Court ruled in *Ex Parte United States.*

And what about current victims, not of the underlying crime, but of its concealment? As the courts below well know from all the submissions, respondent has been a principal at a New York real estate developer, its former Chief Operating Officer and managing director from about 2002 through 2008. JA 298. Even without the submissions the judiciary would have to know, because during that time respondent was under a cooperation agreement and Probation Office knew what he was doing.

It is black letter law that when a principal conceals a fraud conviction from his partners and investors, to whom he owes fiduciary duties of self-disclosure, that is constructive fraud. Respondent Sater has been doing that since he pled guilty in 1998. The courts below must know he has been emboldened to continue his frauds, if for no other reason than that his Probation Officer acknowledged in the 2004 PSR that Doe's racketeering conviction was being hidden from the firm and his partners, including petitioner's clients. The firm's investors, lenders, and insurers have been and continue to be defrauded by this concealment, as petitioner alleged in the civil RICO complaint. That complaint has been languishing under seal for years because the courts wish to "protect Sater's safety," even though, as argued *infra,* no one has ever produced any evidence that there's even any risk.

Back to the original victims. *Dolan* strongly suggests this Court would hold that sentencing respondent today to that long overdue restitution order would not violate due process. With interest or loss of use, that should be about a $ 200,000,000 restitution order by now. If that is the case, then every day that the District Court refuses to do so, it violates the law. *Ex Parte United States.*

Finally, how many other defendants have hidden felony convictions? How many licensed professionals are unlawfully maintaining their licenses by failing to disclose a conviction they know is hidden? How many school-teachers are hiding federal convictions? Doctors? Why is petitioner en-

26

joined from revealing that Sater pled guilty to RICO, and was finally sentenced in October 2009? The reasons for granting this writ are that there myriad victims, and they are us…

A criminal trial comes into existence with at least one aspect, even if merely its existence, presumptively open. By this Court's precedent, any portion of that trial which is presumptively open at inception can only be closed upon the court's finding that one of two tests have been satisfied, a *compelling interest* test or a *countervailing interest* test.

By definition, it can never be a compelling or countervailing interest to a presumption of openness (or to anything else) for a court to seek to operate in violation of the law. No court has a constitutionally cognizable interest in operating illegally, without authority, and so no court has a constitutionally cognizable interest in sealing anything such that to do so would bring about an illegal result.

*Direct Illegality I.* As noted, in *Ex Parte United States*, 242 U.S. 27 (1916), this Court held, unanimously, that a court that fails to follow mandatory sentencing laws violates the separation of powers and acts illegally, specifically stating that even considerations of humanity (*e.g.,* the health and safety of a defendant) would not justify a failure to sentence according to law. 242 U.S. at 51.

The obligation to impose a sentence of mandatory restitution, 18 U.S.C. § 3663A, is a part of mandatory sentencing law, indeed itself states that the order shall be imposed notwithstanding any other law. *Dolan, supra.* Therefore, no order, whether imposed upon satisfaction of a compelling interest or countervailing interest test, which results in a frustration, avoidance, evasion, derogation, or other failure to comply with those laws can be legal.

Whether, and if so to what degree, *Ex Parte United States* applies to other mandatory provisions of sentencing law is to be developed. For example, 18 U.S.C § 3553(c) facially requires a statement of reasons be read aloud in open court as part of sentencing. Presumably *Ex Parte United States* is not limited to substantive statutes. Petitioner submits that where Congress has spoken, even if procedurally, in areas which this Court has determined are within Congressional authority to control, by separation of powers sealing may not legally override it.

27

> **Direct Illegality II.** Nothing in *United States* is married to sentencing law; its logic should apply to anything where Congress constitutionally restricted what a Court might otherwise have the authority to do. For example, as noted, in 1790 (one year after All Writs, thus superseding it in the event of any conflict), Congress passed the forerunner to 18 U.S.C. § 1506, App. 3a, which makes it illegal to "take away" or "avoid" any federal court record with the result that a judgment not take effect.
>
> With respect to those rights to whomsoever applying created by Congress for which final conviction is a condition precedent, no order that frustrates fulfillment of those rights can be legal. The issue is not whether § 1506 creates a private right of action for a judicial taking in a situation like the underlying case where the right to sue respondent in civil RICO based on his RICO securities fraud came into existence only upon his final conviction and entry of judgment but is being concealed from his victims; the issue is that it cannot be legal to conceal it…

## F.  STRUCTURAL DUE PROCESS VIOLATION IN ATTORNEY DISCIPLINE

The ancient maxim *nemo judex in causa sua* - no one shall be a judge in his own cause – is not mere procedural nicety, but bedrock requirement of due process, which the Supreme Court has described as "a mainstay of our system of government." When the body that investigates, prosecutes, and adjudicates professional misconduct is the institution whose reputation and integrity are the subject of the alleged misconduct, irreconcilable conflict arises compromising the proceeding's fundamental fairness.

### i.  The Committee Was a Party-Adversary, not Neutral Arbiter

The Committee is not a neutral arbiter, but rather an indivisible component of *the EDNY itself*. LR 1.5(a) says the "chief judge will appoint a committee of the Board of Judges known as the Committee on Grievances," composed of "Magistrate judges and district judges." The Committee operates "under the direction of the chief judge"

28

with delegated responsibility for "all matters relating to the discipline of attorneys." This hierarchical structure establishes the Committee as an operational arm of the court, functioning within its institutional framework rather than as a separate entity.

When an attorney is charged with making "disparaging" statements about the EDNY—conduct potentially violative of professional conduct rules prohibiting false statements about judicial integrity—the proceeding transforms from one of public protection to institutional self-defense. The court's reputation, authority, and public legitimacy become the direct subject of the dispute. *As legal scholarship recognizes, there is a "current that runs through some judicial opinions... that all lawyer criticism of judges creates public disrespect for the law or the judiciary and thus should be sanctioned without careful regard for its truth or falsity." When EDNY judges sit on a committee to determine if criticism of the EDNY is sanctionable, they are not disinterested parties but guardians of their own institution's reputation, **possibly even if the truth be damned(?).***

### ii.    The Collective Knowledge Doctrine Must Apply

This doctrine, traditionally used in corporate criminal liability, must apply to the EDNY as an institutional entity. This doctrine aggregates individual knowledge within an organization and imputes it to the organization as a whole, keeping complex entities from avoiding responsibility through compartmentalization. If the attorney's allegedly disparaging statements concerned misconduct involving EDNY personnel, procedures, or cases, then the collective institutional knowledge of that misconduct must be imputed to the Grievance Committee. This transforms the Committee from

an impartial body weighing evidence into an informed participant in the underlying dispute, adjudicating a matter in which its own institution is deeply implicated.

### G. CONSTITUTIONAL VIOLATION UNDER *CAPERTON*

This institutional arrangement directly violates the Fifth Amendment′s Due Process Clause requirement of an impartial tribunal. While the judicial disqualification statute (28 U.S.C. § 455) mandates recusal when ″impartiality might reasonably be questioned,″ the constitutional standard goes further. In *Caperton v. A.T. Massey Coal Co.*, the Supreme Court held that due process requires recusal not only for actual bias but when circumstances create a ″serious risk of actual bias″—an objective inquiry based on what a reasonable person would perceive ″under a realistic appraisal of psychological tendencies and human weakness.″

The institutional interest of a court in protecting its reputation from public criticism is at least as ″direct, personal, and substantial″ as the financial interest in *Caperton*. A judge′s authority and professional standing are inextricably linked to public confidence in their court′s integrity. For a committee of judges from the criticized court to sit in judgment of their critic presents an objective serious risk of bias that a reasonable observer would find constitutionally unacceptable.

This risk intensifies when considering that the U.S. Solicitor General admitted by its silence in a Supreme Court filing that the attorney′s core allegations were true. A reasonable observer would conclude that Committee members, as an organ of the EDNY, are not merely at risk of bias but are institutionally charged with knowledge of the very facts they′re adjudicating. The perception becomes one of an informed

30

party sitting in judgment where its own complicity has been admitted in other forums—an overwhelming appearance of bias irreconcilable with due process.

### i.    The Solicitor General's Admission Is Conclusive Evidence

The Committee's decision to find the attorney's statements "false" despite the Solicitor General's contrary admission is not mere error but proof of predetermined bias. The Solicitor General, often called the "Tenth Justice," represents the definitive position of the Executive Branch before the Supreme Court. When the Solicitor General makes a written or *imputed in silentio* admission of fact in a Supreme Court filing, it represents the United States' conclusive position on that factual question.

The Committee's finding of falsity in direct contradiction to this admission cannot be viewed as good-faith disagreement over evidence. It represents deliberate disregard of a conclusive factual determination by the highest legal authority of the Executive Branch—an *ultra vires* act beyond the Committee's legitimate authority. *The Committee, lacking power to contradict the government's definitive position formally declared before the Supreme Court but doing so anyway, revealed its true purpose: not impartial adjudication but vindication of the EDNY's reputation at all costs.*

### ii.    This Was Structural Error So Requires Automatic Vacatur

The meld of inherently conflicted adjudicators, constitutionally impermissible risk of bias, and a decision defying conclusive evidence constitutes structural error. Unlike trial errors that may be quantitatively assessed for harmlessness, structural errors are "defects in the constitution of the trial mechanism... affecting the framework within which the trial proceeds." They defy harmless-error analysis because

they render the whole proceeding unreliable. The Supreme Court identifies a "very limited class" of structural errors, including denial of impartial adjudicators. A biased judge is quintessential structural error because it "infects the entire trial process" and questions the legitimacy of every ruling and the final judgment. While developed for criminal trials, this logic applies equally to any proceeding where due process guarantees a fair hearing, including attorney disciplinary proceedings.

Here, three interlocking defects created complete adjudicative failure:

➤ The proceeding violated *nemo judex in causa sua*—the court sat as judge in its own case

➤ This created a *Caperton*-level serious risk of actual bias from institutional interest in defending reputation

➤ The Committee actualized this bias by disregarding the Solicitor General's dispositive admission

This is not procedural irregularity but a defect undermining the proceeding's integrity. Appellant was denied due process's basic element: a neutral arbiter. Where structural error exists, the judgment is invalid and remedy is vacatur. Appellant need not show prejudice as the harm is denial of fair process itself, the entire proceeding void because the adjudicative framework was constitutionally defective *ab initio*.

## H. In Sum

### i. The Record Shows a Multi-Layered, Systemic Fabrication.

The legitimacy of American constitutional order rests on a core, foundational promise: the judiciary is a bastion of impartial justice, operating under the strictures

of law, not the caprice of individual judges. This case calls this fundamental promise into question, transforming a single judicial order into a Kantian framework, a lens through which a long-festering emergent systemic crisis finally becomes visible.

The purported criminal contempt order issued on March 23, 2011, by the United States District Court for the Eastern District of New York is not merely legal error; it is the visible manifestation of deep and corrosive pathology that has taken root within the federal judiciary and executive branches.

The events surrounding this order, in totality, constitute a multi-faceted *fraud on the court*, revealing a constitutional crisis in all its "glory" unfolding through multiple concomitant violations of the *Caperton* minimum standard of due process.

*First is the underlying institutional fraud of a fabricated secret.* The record shows the case at the heart of this dispute was in fact public record, and the narrative of its "sealing," at least in any cognizable form, was a retroactively constructed fiction.

*Second is the legal fraud of a "presumed order."* Having fabricated the existence of a secret, the court invented a non-existent command to justify punitive retaliatory action against Appellant, repudiating *two centuries of legislative history*.

*Third is the constitutional fraud of biased proceedings.* The objective standard of due process articulated in *Caperton* was violated (a) by a federal district judge acting as both prosecutor *and* arbiter in a cause that directly implicated his and the court's integrity and their role in the initial fabrication; (b) *by this Court* in facilitating those acts by methods and means including backdating events and timelines and

33

fraudulently misrepresenting the nature and consequence of the orders; (c) by Appellee EDNY Grievance Committee in sitting in judgment of Appellant for revealing the frauds despite its legal and undoubtedly factual reality.

**Fourth is the use of contempt power itself as an act of concealment.** The contempt order was a weapon deployed not to vindicate the law, but to silence Appellant who all-too-credibly threatened to continue legally exposing these frauds.

**Fifth is the abuse of court closure and concealment to destroy victims' lives by the worst of all possible thefts, contempt power itself as concealment.** The contempt order was a weapon deployed not to vindicate the law, but to silence Appellant who all-too-credibly threatened to continue legally exposing these frauds.

This sequence of events does more than detail the travails of a single litigant. It illuminates a perilous synergy between the judicial and executive branches, where the courts' coercive powers are used to enforce a collusive pact of secrecy that serves the executives illicit operational demand while shielding the judiciary's procedural misconduct from public scrutiny. Ultimately, this exposes a fundamental flaw in the American constitutional design: the absence of an effective and routine check on a judiciary that chooses with or at the behest of the executive to operate outside the law to the extent that its participants are emboldened to straight-facedly argue in other federal courts that the judiciary may at the executive's request complicitly give it a hall pass to excuse it from performing its duties under Take Care.

34

When the guardians of the law themselves become its violators, the system of checks and balances faces its most severe test. This Appeal will deconstruct this crisis, moving from the specific, documented fabrications to the broader systemic and psychological failures they represent.

### ii.     Constitutional Collapse

The record detailed in Part I establishes a multi-layered and systemic fabrication. The legal analysis in Part II demonstrates that this fabrication resulted in a "constitutional nullity." A rational observer is left with one, unavoidable question: How could such a thing be possible? How could a system of respected jurists and federal prosecutors engage in a years-long "performance art" that required them to invent orders, falsify records, and openly defy the Constitution?

The answer is that this was not a series of isolated mistakes or the work of a few rogue actors. It was the predictable and emergent behavior of a system that has become a ***pathocracy***—an institution whose logic is no longer governed by the rule of law, but by pathological instinct for self-preservation. A following section provides historical and psychological frameworks to understand this systemic collapse.

### iii.     Historical Precedent: A 170-Year-Old Institutional Habit

The "performance art" of a secret, parallel justice system is not a modern invention. The institutional habit was born in the moral catastrophe of the 1850s. The Fugitive Slave Act of 1850 created a system of federal commissioners who were financially incentivized to deny due process, paying them twice as much to return an alleged fugitive to slavery than to set them free. This was the first, and most blatant,

example of the federal government creating a judicial system designed not to find truth, but to produce a predetermined, politically necessary outcome. It was a system that, by its very design, self-selected for officials willing to place government convenience above the written law.

The nation's first great constitutional crisis over judicial tyranny came to a head with the impeachment of Judge James H. Peck, who used the contempt power to punish a lawyer for criticizing his opinion. The subsequent **1831 Contempt Act** was Congress's definitive and permanent legislative judgment on this issue. It was a cage built to contain judicial overreach, explicitly stripping judges of the power to punish for perceived disrespect and limiting their authority to the enforcement of clear, lawful orders. The events in this case are a direct and willful defiance of that 200-year-old legislative command, proving the truth of Santayana's warning: "Those who cannot remember the past are condemned to repeat it."

### iv.    The Psychological Engine: "Monsters from the Id"

The Constitution was designed by Enlightenment thinkers to contain the predictable vices of rational men—"knavery" and "roguishness." It has no built-in defense against a system that has become collectively irrational. The pathology is driven by the psychological phenomenon of *identity fusion*, a state where an individual's sense of self becomes inextricably linked to their group. A threat to the institution is perceived as a direct, personal, and existential attack.

This is the central lesson of the film *Forbidden Planet*. The invisible, murderous monster that destroyed an advanced civilization was not an external enemy; it was

36

the **"Monster from the Id,"** the physical manifestation of the subconscious rage of a single, brilliant individual whose mind was fused with a powerful machine. The judicial system is that machine. When it felt threatened by the exposure of its secrets, it unleashed its own "Monsters from the Id" – the fabricated orders, the altered records, the bad-faith arguments – to destroy the source of that threat. These are not the actions of rational actors; they are the panicked, self-destructive lashing out of a system in a state of psychotic decompensation.

### v. Normalizing Pathocracy: A Training Manual for Corruption

This pathological behavior has been normalized and even taught. In a January 2000 Brooklyn Law School panel discussion, a group of senior and influential judges in the EDNY and SDNY openly workshopped the mechanics of creating *sham trial dates, feigned proceedings,* and other forms of "performance art" to get outcomes they deemed necessary. This was no secret meeting; it was a published law review article. It was the system holding a masterclass in its own corrupt methodology, all under the guise of "honest" debate about difficult choices.

This discussion reveals the system's true philosophy, as articulated by its most influential members: that the law is a mere "guideline," and that a judge has a duty to "play fast and loose with procedure for the greater good," a philosophy of kingship, not of law. When leaders of a "union" teach this doctrine, it is no surprise when rank and file" follow. The events in this case were not aberrations, but direct and foreseeable results of institutional culture that taught its members they are above the law.

37

### vi. Historical-Philosophical Crisis Roots: Emergence of a Pathocracy: Monsters from the Id (cont'd…)

*Systemic Consequences: A Market for Bad Legal Advice and Thefts of Rights.*
This institutional pathology has devastating real-world consequences, creating what Professor William Simon calls a "market for bad legal advice" and resulting in what you have termed *geneivat da'at*—the theft of mind and awareness. The secret docket system is not a passive concealment; it is an active mechanism for fraud. By hiding criminal proceedings, it serves two illicit purposes:

- *It sells a clean public record to the cooperator.* A defendant like Sater, despite a conviction for massive fraud, has no publicly searchable criminal record, allowing him to operate in the business world under false pretenses.

- *It deprives victims of their statutory rights.* By ensuring victims are not told of the proceedings, the system makes it impossible for them to claim rights to restitution under the Mandatory Victims Restitution Act (MVRA) and the Crime Victims' Rights Act (CVRA). This was confirmed by an on-the-record admission from an EDNY AUSA in November 2010, who stated it was the office's practice not to inform victims in cooperating witness cases.

This constitutes a massive, uncompensated and so unconstitutional "taking" of property by the government, or a comparable illegal exaction. Victims' statutory rights to restitution are extinguished for the "public use" of securing a cooperator's assistance. Appellant's lawsuit in the Court of Federal Claims for the *$8 billion in*

38

*wealth transferred from victims to thieves* by this design is a direct attempt to hold the government accountable for the financial consequences of this systemic fraud.

The evidence in this case no longer points, if it ever did, to a mere abuse of power, but to coordinated, multi-layered fabrication of fact and law by the District Court, U.S. Attorney's Office, and U.S. Court of Appeals for the Second Circuit. It reveals a system that if threatened abandons rule of law to protect itself, weaponizing secrecy and creating fictions to punish those who expose the truth. More than a constitutional crisis in miniature, it is evidence of a functioning pathocracy weaponizing the judicial process itself. The appellate remedies sought—*vacatur ab initio for fraud on the court and intolerable likelihood of bias*—are not about correcting a single case, but about beginning the necessary, urgent work of confronting the "monsters" that have emerged from within the system itself.

### vii.      Flaw in Constitutional Design, Crisis of Judicial Accountability

This case, interlocking statutory violation, constitutional failure, and systemic deception, confronts an unsettling question: *Quis custodiet ipsos custodes?* Who guards the guards themselves? Events like *Sater's* secrecy and Appellant's contempt reveal Constitutional vulnerability: Checking is predicated on the assumption the judiciary, while not infallible, operates largely in good faith within bounds of law. The system is built to correct legal *error* through appellate review and punish egregious individual *corruption* through the political mechanism of impeachment. It has no mechanism to counter *systemic, institutional misconduct*, especially when that misconduct is carried out in collusion with the executive, shielded by doctrines of immunity and secrecy.

39

This case exposes the limits of the traditional checks. Appellate review, the primary check on lower court error, can fail when the culture of secrecy is pervasive. If the initial act of "phantom sealing" hides the very existence of a case from public and appellate scrutiny, there is nothing to review. Furthermore, when the appellate courts themselves are part of the same institutional culture, they may be disinclined to rigorously police the procedural shortcuts of their colleagues, particularly when powerful national security interests are invoked by the executive branch.

Impeachment, the Constitution's ultimate remedy for judicial malfeasance, is a political tool too blunt, too cumbersome, and too impractical to address this kind of deep-seated procedural corruption. The impeachment of Judge Peck in 1831 was a rare and momentous event, triggered by a single, publicly visible act of tyranny.[1] It is ill-suited to address a widespread, low-visibility practice like "phantom sealing," which is more akin to a systemic administrative disease than a singular dramatic crime. For impeachment to be a viable check, the misconduct must be so egregious and so politically unpalatable that it can capture the sustained attention of Congress. Systemic procedural violations, hidden within the arcane workings of the court system, rarely meet that threshold.[1]

This reveals the fundamental flaw: the Constitution provides no clear answer when the judiciary, as an institution, chooses to disregard the statutory limits placed upon it by Congress, and when it does so in partnership with the executive branch. When the judiciary can effectively nullify a statute like the 1831 Contempt Act by reasserting a nebulous "inherent power," the legislative check on the judiciary is broken. When the judiciary uses that power to enforce a secrecy pact with the executive, the

40

check of public and press scrutiny is neutralized. What remains is a branch of government that has become the sole arbiter of its own power, accountable only to itself. The *Sater* case is a microcosm of this crisis. It demonstrates that when judicial and executive interests align to subvert the rule of law, the constitutional safeguards designed to prevent such abuses can be rendered inert, leaving a vacuum of accountability at the very heart of the constitutional order.

## VII.  CONCLUSION AND RELIEF SOUGHT

Wherefore, Appellant prays this Court order vacatur *ab initio* of all decisions rendered by Appellee, ***with prejudice***, and other relief, in law or equity, it feels due.

Montauk, New York
August 14, 2025

/s/ Frederick M. Oberlander, Esq.
43 West 43rd Street, Ste. 133
New York, NY 10036
646-901-1574
212-202-7624 Fax

42

## CERTIFICATE OF COMPLIANCE

**Type-Volume Limit, Typeface Requirements and Type-Style Requirements**:

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding parts exempted by Fed. R. App. P. 32(f): this document contains no more than 11,900 words, and with various limit imposed by order of this court, wtih cross-adoption it contains no more than 39,000 words. It complies with the typeface requirements of Fed. S. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has has been prepared in 14-point Equity Tab A, a proportionally spaced serif typeface using Microsoft Word/Office 365.

Dated:

Montauk, New York

August 14, 2025

Frederick M. Oberlander, Esq.
*Pro Se Respondent-Appellant*