# PLAINTIFF'S REQUEST FOR ORDER COMPELLING PRODUCTION OF JURISDICTIONAL EVIDENCE  (I of II)

*Due to miscommunication when I corrected the T1080 I did not upload a new copy of the Exhibit filed on the 16th. I assumed would copy . I didn't get  answer how to fix till  yesterday. No changes made. If my opponent be aggrieved by the delay though he may have been served with it then I consent as he may request on this account for his response as the Court deems  reasonable. AS TWO WEEKS PASSED PART II WILL BE FILED IMMINENTLY IN CLAIMS MATCHED WITH A*

*MOTIONTO RECALL MANDATE OF 10-2905  HERE AND THIS SUPPMENTED.*

## The Pathology of Jurisdictional Fabrication: A Forensic Analysis of the Unitary Scheme, Appellate Laundering, and Fraud on the Court of Federal Claims

*Plaintiff respectfully moves for an order compelling the Department of Justice to produce the 1998 sealing order it asserts as the jurisdictional predicate for its pending Rule 12(b)(1) motion. This request is filed to preserve procedural deadlines and will be supplemented by Part II, expanding upon the evidentiary and statutory analysis.*

This ongoing litigation within the United States Court of Federal Claims (CFC), is at a critical inflection point in its decades-long jurisprudential crisis. At the epicenter of this dispute is the deployment by the Department of Justice (DOJ) of a purported 1998 sealing order—allegedly issued in the criminal proceedings of cooperating witness Felix Sater (*United States v. Sater*, EDNY No. 98-cr-1101)—to defeat a Fifth Amendment Takings and illegal exaction claim brought by the victims of Sater's financial crimes.[1]

The analysis in this filing deconstructs the DOJ's procedural posturing, specifically its reliance on Rule 12(b)(1) jurisdictional defenses while actively suppressing the foundational documentary evidence required to substantiate those defenses.[1] By synthesizing the statutory mandates of the Mandatory Victims Restitution Act (MVRA) and the Crime Victims' Rights Act (CVRA), the congressional testimony of former federal judge Paul Cassell, and newly established strict formalist appellate precedents of 2026, we map an integrated "Unitary Scheme" of institutional obstruction[1] and further outline specific mechanics of cross-jurisdictional strategic architecture designed to expose systemic ontological fraud, compel production of the phantom sealing order, and neutralize the collateral preclusion traps orchestrated by the government.

# 1. Deconstruction of DOJ's Rule 12(b)(1) Motion to Dismiss

The Department of Justice's July 2016 Motion to Dismiss (MTD) in the CFC aggressively advances a jurisdictional defense under Rule 12(b)(1) of the Rules of the Court of Federal Claims (RCFC).[1] The government constructs a multi-layered argument asserting that the CFC is structurally barred from hearing the plaintiffs' claims. We here deal only with the one: The fatal structural flaw in the DOJ's 12(b)(1) architecture lies not in its recitation of Tucker Act precedent, but in the procedural mechanics of its application to the specific facts of the underlying sealing regime. The government's entire defense is predicated upon an assumption: physical existence and lawful validity of a 1998 sealing order issued by Judge Glasser.[1]

## 2.1 The Procedural Distinction in Federal Jurisprudence

Under federal jurisprudence, a 12(b)(1) challenge can manifest as either a "facial attack" or a "factual attack".[5] A facial attack accepts all allegations in the plaintiff's complaint as true and merely questions the sufficiency of the pleading on its face.[6] A factual attack, however, challenges the underlying truth of the jurisdictional facts, shifting the burden to the plaintiff to prove jurisdiction by a preponderance of the evidence, and granting the court the affirmative authority to weigh extrinsic evidence to confirm its subject-matter jurisdiction.[5]

The DOJ attempts to seamlessly frame its motion as a facial attack, relying entirely on the assumed existence of a prior, valid judicial decree (the sealing order) that precludes CFC intervention. However, the plaintiffs' amended complaint explicitly—and under oath—alleges that *no such sealing order exists*. The plaintiffs assert that the secrecy was achieved through off-the-books, extra-judicial concealment rather than a lawful, written order.[4] Because the plaintiff actively challenges the existence of the very document the government relies upon to strip the court of jurisdiction, the DOJ's reliance on the preclusive effect of that order legally constitutes a quintessential factual attack.[4]

## 2.2 The Jurisdictional Paradox and the Duty of Inquiry

This dynamic creates a profound procedural paradox. The DOJ asserts factual existence of a judicial decree that strips the CFC of jurisdiction, yet absolutely refuses to introduce the physical text of that decree into the record.[4] The government demands that the CFC accept "hypothetical jurisdiction" over a preclusion event based purely on unsworn attorney proffer, effectively asking the court to validate a factual barrier without permitting it to inspect the barrier itself.[4]

This refusal triggers the exact scenario addressed by the Second Circuit in *Potamkin Cadillac*

*Corp. v. B.R.I. Coverage Corp.* (38 F.3d 627, 1994).[10] In *Potamkin*, the appellate court reinforced the trial court's strict "duty of inquiry" when a party seeks to rely on an underlying record to prove a claim or defense but actively refuses to produce the underlying source documents for inspection.[4] *Potamkin* establishes that an advocate's characterization of a document is argument, not evidence.[4] When the existence or content of a document determines the court's power to act, the court has an affirmative duty to inspect that document. A party cannot use a phantom document as a sword to terminate litigation while using procedural secrecy as a shield to prevent the tribunal from authenticating the weapon.[4]

# 3. Ontological Fraud and the Epistemology of the Prolegomena

To pierce the government's procedural shield, the plaintiffs filed a highly unconventional demand for jurisdictional discovery, titled "Prolegomena," which systematically dismantles the illusion of the sealing regime.[1] The filing utilizes a complex philosophical and rhetorical framework—drawing upon Kantian epistemology, Cicero's *captatio benevolentiae*, and classical tragedy—to force a moment of "anagnorisis" (recognition) upon the CFC judge.[1]

## 3.1 The Psychological Burden of Recognition

The Prolegomena argues that the CFC is trapped in a manufactured reality, a "kind of reality" meticulously curated by the DOJ to prevent the court from perceiving the systemic failure of the justice system.[1] The filing draws an analogy to the psychological mechanism of cognitive dissonance, illustrating how the human mind naturally recoils from evidence of profound systemic corruption.[1] By recounting a World War II anecdote about the psychological protection of ignorance, the plaintiffs suggest that the court itself may be subconsciously resisting the reality of the DOJ's fraud because acknowledging it would require dismantling the court's foundational trust in coordinate federal institutions.[1]

The objective of the Prolegomena was not merely legal, but epistemological. It aims to guide the court through the uncomfortable realization that the "sealing order" is a legal fiction—an illusion analogous to the realization in *The Sixth Sense* or *Oedipus Rex* that the fundamental parameters of reality have been inverted.[1]

## 3.2 The Sworn Absence of the Res Corporalis

Beyond its philosophical framing, the Prolegomena contains devastating, sworn factual assertions. Frederick Oberlander and Richard Lerner, operating under penalty of perjury (28 U.S.C. § 1746), formally attest that the purported 1998 sealing order physically does not exist.[1]

This assertion is anchored in the certified historical record of the EDNY proceedings. According to transcripts from a June 14, 2010 hearing before Judge Glasser—the very judge purported to have issued the order—the court was challenged to produce the sealing order that supposedly bound the whistleblowers and explicitly stated on the verbatim record: *"So when your letter asks me to show you what order is directed to Mr. Oberlander, there isn't any".*[2]

This is a judicial confession of a chronological nullity. At the moment the whistleblowers accessed the *Sater* files—which the government had lawfully earlier transferred to a public National Archives and Records Administration (NARA) reading room in 2004—and utilized them to file their civil RICO complaint, there was no physical written order in existence to be defied.[2] The government's entire jurisdictional defense in CFC is built on enforcement of a void.

# 4. DOJ Opposition, Consciousness of Guilt, and Ongoing Fraud

Faced with the plaintiffs' sworn demand for jurisdictional discovery to produce the phantom sealing order, the DOJ filed a highly revealing three-page Opposition in April 2025.[1] The government's response provides profound evidence of consciousness of guilt and constitutes an ongoing fraud upon the court.

## 4.1 The Pivot to a Facial Attack

In its Opposition, the DOJ fiercely resists producing the sealing order, arguing that the document "will not further assist the Court in ruling on the jurisdictional challenges raised in the motion to dismiss".[1] To justify this refusal, the DOJ executes a rapid procedural retreat. It attempts to abandon the factual attack regarding the sealing order and instead begs the court to treat the 12(b)(1) motion exclusively as a facial attack.[1] The government explicitly states that its motion to dismiss "relies upon the statement of facts as set forth in plaintiffs' first amended complaint" and asks the court to assume that the plaintiffs' facts (including the fact that no order exists) are true.[1] The DOJ effectively asks the CFC to ignore the sealing order argument—the very argument that forms the factual core of its collateral attack defense—and to dismiss the case based solely on the other two statutory grounds (the MVRA/CVRA damages disclaimers and the exclusive district court vesting).[1]

## 4.2 The Mechanics of Fraud on the Court

This procedural pivot is not merely aggressive advocacy; it crosses the threshold into actionable *fraud on the court*. As established in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.* (322 U.S. 238), fraud on the court occurs when an officer of the court engages in unconscionable schemes calculated to interfere with the judicial system's ability to impartially to adjudicate a matter.[13]

By retaining the collateral attack defense in its pending 12(b)(1) motion—a defense fundamentally predicated on the existence of a sealing order—while simultaneously refusing to produce the order and asking the court to conceptually ignore its absence, the DOJ is attempting to maintain benefits of a fabricated document without subjecting it to forensic scrutiny.[4] The failure to formally withdraw the sealing order argument, combined with active suppression of discovery that would definitively prove its non-existence, constitutes an active, ongoing deception.[1] The DOJ is willfully leveraging a known chronological nullity to terminate a multi-million dollar Tucker Act claim, defiling the integrity of the CFC's adjudicative process.

# 5. Paul Cassell's Testimony, Constitutional Mutiny, and 1512(c)(2) Obstruction

The weaponization of this phantom sealing order extends far beyond civil preclusion in the CFC; it has been systematically deployed by the DOJ as an instrument of federal obstruction and witness intimidation. This reality was laid bare in the May 2015 congressional testimony of Paul G. Cassell, a former United States District Judge and preeminent victims' rights scholar.[1]

## 5.1 Systemic Subversion of the MVRA and CVRA

In his testimony before the House Judiciary Subcommittee on the Constitution, Professor Cassell detailed the systemic failure of the justice system to adhere to the statutory mandates of the MVRA and CVRA.[1] The MVRA explicitly strips sentencing judges of discretion, dictating that the court "shall order that the defendant make restitution to the victim of the offense".[1]
Cassell provided the Subcommittee with a specific, undeniable real-world illustration: the case of Felix Sater.[1] He testified that the U.S. Attorney's Office for the Eastern District of New York (then led by Loretta Lynch) deliberately bypassed the MVRA's mandatory restitution requirements to preserve Sater's utility as a cooperating intelligence asset.[1] The DOJ accomplished this not through a lawful application of statutory exceptions, but by entirely hiding the criminal docket, withholding the victim list from the Probation Office during the pre-sentence investigation phase, and secretly sentencing Sater in 2009 without ordering a single dollar of restitution for the estimated $40 million he stole.[1] The CVRA's mandate for public notice and the right to be heard at sentencing were similarly eradicated in the dark.[1]

## 5.2 Intimidation of a Former Federal Judge

The most alarming aspect of the Cassell incident involves the DOJ's aggressive enforcement of the phantom sealing order to chill congressional oversight. When Cassell initially attempted to testify about the *Sater* anomaly to Congress, the U.S. Attorney's Office threatened him with contempt,[1] cited the sweeping, undefined parameters of the alleged sealing orders issued by Judge Glasser and subsequently enforced by Judge Cogan.[1]

Crucially, Cassell noted that the DOJ outright refused to show him the very orders they accused him of potentially violating, leading him to conclude that "there didn't seem to even be any".[1] Cassell, a former Article III judge, was placed in a Kafkaesque position: he was threatened with incarceration and professional ruin for violating a directive he was legally prohibited from reading, which likely did not exist in physical reality.

## 5.3 18 U.S.C. § 1512(c)(2) and Constitutional Mutiny

This dynamic—where executive branch prosecutors utilize a non-existent or inaccessible judicial decree to silence a former federal judge and prevent a coordinate branch of government (Congress) from investigating statutory subversion—amounts to constitutional mutiny.[1] Within the context of federal criminal law, the insertion of a fictitious or retroactively manufactured judicial directive into a litigation stream to subvert the trajectory of an official proceeding perfectly mirrors the *actus reus* of 18 U.S.C. § 1512(c)(2) (corruptly obstructing, influencing, or impeding an official proceeding).[1] As analyzed in precedents such as *United States v. Reich*, injecting a forged or phantom judicial order to manipulate a legal outcome constitutes severe document-focused obstruction.[13] The DOJ's continued reliance on this exact same phantom order in the CFC to deprive the victims of their day in court represents an unbroken continuation of this obstructive scheme.

# 6. Appellate Laundering and the Strict Formalist Precedents of 2026

To understand how a phantom order from 1998 continues to wield destructive power in the CFC in the 2020s, one must analyze the mechanism of "Appellate Laundering" executed by the Second Circuit Court of Appeals, and the subsequent eradication of that mechanism by watershed appellate precedents in 2026.[2]

## 6.1 The Mechanics of Appellate Laundering

When the whistleblowers initially exposed the *Sater* fraud in 2010, the EDNY trial court realized it lacked a physical sealing order to enforce. On March 23, 2011—nine months after the conduct in question—the court generated a formal written order retroactively "presuming" that a sealing order must have existed in 1998 and declaring the prior conduct to be contumacious.[2]

The Second Circuit sustained this temporal impossibility in June 2011 via a summary mandate (*Roe v. United States*, 428 F. App'x 60).[1] The court affirmed the sealing regime, certifying that it had conducted an independent, *item-by-item de novo* review of the sealing orders.[1] However, *de novo* textual review requires the physical existence of a text. Because the trial transcripts prove no such written text existed at the time of the conduct, it was a physical and logical impossibility to execute a *de novo* review.[2]

The appellate tribunal forcefully projected formalist narrative over historical reality, laundering a retroactive fabrication into binding precedent through linguistic ambiguity. The mandate stated that the 2011 retroactive order merely "reflected" a pre-existing state of affairs, transforming the appellate layer from a mechanism of error correction into an instrument of error ratification.[13] Furthermore, because notices of appeal had already been filed concerning the trial court's initial actions, the district judge was completely divested of jurisdiction over the core aspects of the case. The subsequent generation of the March 23, 2011 order was executed *functus officio*, rendering foundational contempt predicate jurisdictionally void ab initio.[13]

## 6.2 The Sheehan Formalist Axiom (Second Circuit, 2026)

The government's reliance on ambient courtroom expectations, "implicit" sealing directives, or the "spirit" of secrecy was categorically annihilated in March 2026. In its landmark mandate in *Sheehan v. Starbucks Corp.* (No. 25-189), the Second Circuit established an absolute jurisdictional axiom regarding coercive and punitive judicial sanctions.[3]

The Second Circuit held that sanctions (including civil contempt, criminal contempt, and professional disbarment) are legally and mathematically unavailable unless the enforcing tribunal can point to a "clear and unambiguous" formal written order on the physical record at the exact chronological moment the alleged conduct occurred.[3] *Sheehan* explicitly nullified the concept of "implicit directives," ruling that contempt cannot be derived implicitly from general bad faith or retrospective docket reconstructions.[3] The maxim established is absolute: *"absent a violated order, contempt cannot stand".*[3]

Because the EDNY Grievance Committee currently prosecuting the whistleblowers has explicitly conceded in its briefs that the 1998 sealing regime was merely an "implicit directive" or an "inescapable conclusion", they have formally confessed that the mandatory jurisdictional hook required for contempt under Second Circuit law does not exist.[3] Subjecting whistleblowers to an unwritten regime where orders are hallucinated, while affording corporate entities like those in *Sheehan* strict formal protections, is a severe Equal Protection "Class-of-One" violation.[3]

## 6.3 Absolute Textual Supremacy: In re Donald J. Trump (D.C. Circuit, 2026)

This formalist shift was compounded in April 2026 by the D.C. Circuit's mandamus opinion in *In re Donald J. Trump* (No. 25-5452).[3] In terminating a criminal contempt proceeding against Executive Branch officials, the D.C. Circuit held that when a trial court issues a formalized written order, that written text completely extinguishes all prior unexpressed intentions, expectations, or fluid oral instructions delivered from the bench.[3]

Any omissions or ambiguities in the final written text must redound entirely to the benefit of the accused contemnor; intent cannot be read back into a document to backfill historical gaps.[3] When integrated with Judge Glasser's June 2010 on-record admission that *"there isn't any"* written order, the *Trump* mandate establishes a total absence of a written *res corporalis*.[3] The ambient "understandings" of secrecy circulating during Sater's 1998 plea allocations were legally extinguished by the failure to commit them to a valid Rule 58-compliant written instrument.[3]

# 7. The Unitary Scheme and the CFC Pincer

To combat this entrenched institutional pathology, the plaintiffs' strategy aggregates these decades of disparate financial crimes, statutory subversions, and judicial cover-ups into a single, indivisible "Unitary Scheme to Defraud".

## 7.1 The Three Phases of the Unitary Scheme

The architecture of this scheme operates along a continuous operational continuum:

1. **Phase 1 (Primary Extraction):** The foundational multi-million dollar securities frauds, tax evasion, and money laundering schemes orchestrated by the primary wrongdoers.
2. **Phase 2 (Weaponized Silence):** The deliberate suppression of mandatory victim notifications under the CVRA and MVRA (the "Phantom Docket") to keep injured parties blind to proceedings and to allow the cooperator to retain stolen assets as an unwritten reward for cooperation.
3. **Phase 3 (Judicial Deceit and Retaliation):** The fabrication of retroactive sealing records, "Appellate Laundering" of impossible timelines, and weaponization of grievance committees to professionally and financially execute whistleblowers who pierced the veil.

## 7.2 The Cross-Jurisdictional Estoppel Vise

To shatter the third phase of this scheme, we leverage a game-theoretic maneuver we call the "CFC Pincer". This maneuver traps the United States Government in an inescapable, mutually destructive legal contradiction across two active federal dockets.

In the CFC, to defeat the Tucker Act jurisdiction and avoid paying out the massive restitution taking, the DOJ is actively demanding dismissal by suggesting it possesses a physical, tangible "secret copy" of the 1998 sealing order, which it refuses to produce. Concurrently, in the Second Circuit disciplinary track, the Grievance Committee formally concedes that the physical order does not exist and is merely an unwritten "implicit directive".

The DOJ cannot simultaneously maintain both realities. If they admit the order's non-existence to satisfy the Second Circuit's disciplinary narrative (and comply with *Sheehan*), the 2011 mandate is rendered void *ab initio*, proving the Illegal Exaction in the CFC. If they assert existence to block the CFC Takings claim, we trigger severe Judicial Estoppel, forcing CFC to demand production of the phantom document outside the sphere of influence of the conflicted circuit, instantly imploding the Grievance Committee's current "implicit directive" prosecution.

# 8. Strategic Mandates and Advice for the Court of Federal Claims

The culmination of this analysis dictates a highly aggressive, affirmative posture for the plaintiffs in the Court of Federal Claims. Standard defensive compliance against the DOJ's 12(b)(1) motion is structurally inadequate to invert the government's procedural shield into a sword. The following strategic advice dictates what we must communicate to the CFC.

## 8.1 Assert the Duty of Inquiry and Compel Production

We advise the CFC to reject the DOJ's attempt to convert the 12(b)(1) motion to a facial attack.[1] The DOJ's entire collateral attack argument is predicated on the legal effect of a specific piece of extrinsic evidence (the sealing order).[4]

Relying on the *Potamkin Cadillac*, we demand that CFC assert its independent "duty of inquiry" to determine jurisdictional facts.[4] The court cannot accept the "fact" of a sealing order's preclusive power based solely on the unsworn proffer of DOJ attorneys, especially when those same prosecuting authorities are actively pursuing opposing counsel in a coordinate jurisdiction based on the concession that the document is merely "implicit".

The CFC must issue a formal order compelling DOJ to immediately produce the physical sealing order for review, or formally explain why they cannot.[4] If the DOJ refuses to comply, or if they admit that no such physical order from 1998 exists, the CFC must be asked to apply severe

adverse inferences: specifically, that the order does not exist, that it cannot bar jurisdiction, and that the government waives any 12(b)(1) defense based upon it.[4]

## 8.2 Invoke Hazel-Atlas and the Duty to Clean Up Appellate Fraud

If the DOJ continues to rely on the "Appellate Laundered" mandates of the Second Circuit (specifically the June 2011 summary order) to prove that the CFC lacks jurisdiction, we must advise the CFC of the perpetual equitable authority established in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.* (322 U.S. 238).[13]

*Hazel-Atlas* establishes that federal courts possess an inherent, non-delegable power to vacate judgments or strike pleadings that have been procured through a fraud that "defiles the court itself".[13] The plaintiffs must explicitly argue that the DOJ is committing an active, ongoing fraud upon the Court of Federal Claims by utilizing a document known to be a "Chronological Nullity" to obstruct a valid Tucker Act Takings claim.[13]

Crucially, this *Hazel-Atlas* invocation abandons generalized claims of subjective judicial "bias," We will demonstrate that DOJ is asking the CFC to validate an appellate mandate that purports to have conducted *de novo* textual review of a document the trial judge admitted did not exist.[2]

The Second Circuit has a non-delegable obligation to fix its own fraud by recalling the tainted mandate.[1] Concurrently, the DOJ has an absolute ethical obligation to clean up its use of that fraudulently obtained CA2 mandate in the Court of Federal Claims.[1] Falsifying an appellate record to launder a lower court's retroactive fabrication, and then submitting that laundered mandate to the CFC to defeat civilian property rights, is the ultimate manifestation of structural fraud and an undeniable 18 U.S.C. § 1512(c)(2) violation.[1]

## 8.3 The Judicial Takings Doctrine and the Economic Off-Ramp

By forcing the DOJ into this corner, the plaintiffs activate the core mechanics of Real Options Theory (ROT) and Measure Theory underlying their Tucker Act claim.[2] The statutory right to demand full financial restitution under the MVRA is a vested property interest (a financial chose in action). By creating a total procedural barrier via a phantom docket, the government drove the transaction barrier of accessing the public records to infinity, collapsing the economic measure of the victims' property interest to absolute zero.[2] This destruction operates as an unconstitutional judicial taking and an illegal exaction.[2] As reinforced by the Federal Circuit's 2024 decision in *Darby Development Co. v. United States*, an action is authorized for takings purposes if officials acted in the scope of their duties defined by what might be chargeable to Congress, even if the specific application (the phantom sealing) was unconstitutional or illegal.[2]

And, *Sheetz v. County of El Dorado* (2024) cements the branch-neutral principle of the Takings

Clause: a judicial order that destroys a property right carries the same constitutional liability as a legislative statute.[2] We will provide the DOJ with a calculated, economically quantifiable legal off-ramp. As CFC's jurisdiction is economic, the government can choose to settle or concede the Takings claim, paying the restitution value out of the federal Judgment Fund.[2] This financial concession would satisfy the victims' property interests and dissolve the underlying controversy without enduring catastrophic institutional humiliation of admitting to the systemic fraud.[2]

# 9. Conclusion

The DOJ's Rule 12(b)(1) motion in the Court of Federal Claims is not a standard invocation of sovereign immunity or collateral preclusion; it is the final defensive mechanism of a Unitary Scheme designed to conceal the state-sponsored subversion of the Mandatory Victims Restitution Act. By weaponizing a "Chronological Nullity"—a sealing order that physically did not exist at the time it was allegedly violated, and which violates the strict formalist axioms of *Sheehan* and *Trump*—the government is engaging in active ontological fraud.

The Court of Federal Claims cannot permit its jurisdiction to be circumvented by hypothetical decrees or implicit regimes. We will aggressively compel production of the *res corporalis*, and demand *Hazel-Atlas* scrutiny of the appellate record. The DOJ's attempt to intimidate witnesses like Paul Cassell and weaponize phantom orders to obstruct coordinate branches of government constitutes severe constitutional mutiny. The disinfectant of sunlight is not merely a rhetorical flourish; in the context of jurisdictional facts and federal property rights, it is a constitutional imperative. The order must be seen to be obeyed, and if it cannot be seen, it cannot bind.

"Plaintiff requests that the Court issue an order directing immediate production or formal admission of non-existence. A supplemental memorandum (Part II) will follow shortly."

## Works cited

1. Document5 03 short.docx
2. Unitary Scheme Mens Rea Analysis, https://drive.google.com/open?id=1l5jrex-NA4dHllN0GinB8p6iHKaurjLlxvznuNK6Uu0
3. Resuming Abeyance Motion Defense Strategy, https://drive.google.com/open?id=1EM5lHRK6eWTKY_QM01U2MvB1JLrPYngL4Y1KcoQCBnc
4. DOJ Sealing Order Dispute Analysis, https://drive.google.com/open?id=1VNjUKLNXXKN_ESR1B05HaroiuozvGIRWkAOWNxiPaKc
5. In the United States Court of Federal Claims, accessed July 16, 2026, https://ecf.cofc.uscourts.gov/cgi-bin/show_public_doc?2016cv0492-92-0
6. Hope Hospice Inc v. United States of America, No. 2:2022cv01365 - Document 31 (N.D. Ala. 2023) - Justia Law, accessed July 16, 2026, https://law.justia.com/cases/federal/district-courts/alabama/alndce/2:2022cv01365/183170/31/

7. In the United States Court of Federal Claims, accessed July 16, 2026, https://ecf.cofc.uscourts.gov/cgi-bin/show_public_doc?2023cv1580-16-0

8. In the United States Court of Federal Claims, accessed July 16, 2026, https://ecf.cofc.uscourts.gov/cgi-bin/show_public_doc?2022cv0578-15-0

9. Anderson v. United States | No. 1:18-CV-003011-SAB | E.D. Wash. | Judgment - CaseMine, accessed July 16, 2026, https://www.casemine.com/judgement/us/647849d645fbd7687b4c2831

10. Potamkin Cadillac Corp. v. B.R.I. Coverage Corp. (1994) Overview | LSData Case Brief Video Summary - YouTube, accessed July 16, 2026, https://www.youtube.com/watch?v=y0mxr8kF21g

11. UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT, accessed July 16, 2026, https://cases.justia.com/federal/appellate-courts/ca9/07-16187/07-16187-2011-02-25.pdf?ts=1411054734

12. Documentary Evidence - Shipman & Goodwin LLP, accessed July 16, 2026, https://www.shipmangoodwin.com/a/web/jVGwr8ChzQjLYaJESs3QmG/Xbww5/19628_Chapter09Final.pdf

13. Fraudulent Sealing Order Appeal Analysis, https://drive.google.com/open?id=1QxV0EjzOBwFP0XKilIl5x3ALSg8-E5_CliBdGX7K2TA

14. statement of paul g. cassell ronald n. boyce presidential professor of criminal law sj quinney - House Judiciary Committee, accessed July 16, 2026, https://judiciary.house.gov/sites/evo-subsites/judiciary.house.gov/files/2016-02/05012015-Cassell-Testimony.pdf

15. Attorney General Nomination Insights | PDF | Bureau Of Alcohol | Obscenity - Scribd, accessed July 16, 2026, https://www.scribd.com/document/348106629/AG-Nominee-Loretta-Lynch-Response-to-Sen-Orrin-Hatch

16. dyzf,- a, d*r- - Senate Judiciary Committee, accessed July 16, 2026, https://www.judiciary.senate.gov/download/lynch-qfr-2915

17. United States Court of Appeals - First Circuit, accessed July 16, 2026, https://media.ca1.uscourts.gov/pdf.opinions/21-1983P-01A.pdf

18. Circuit Circus: What is the Correct Standard of Review Applicable to Supervised Release Appeals after United States v. Booker? - ValpoScholar, accessed July 16, 2026, https://scholar.valpo.edu/cgi/viewcontent.cgi?article=2229&context=vulr

19. Google Sports Data, accessed July 16, 2026, https://support.google.com/knowledgepanel/answer/9787176

20. In re: Donald Trump, No. 25-5452 (D.C. Cir. 2026) - Justia Law, accessed July 16, 2026, https://law.justia.com/cases/federal/appellate-courts/cadc/25-5452/25-5452-2026-04-14.html

21. In re - U.S. Court of Appeals for the D.C. Circuit, accessed July 16, 2026, https://media.cadc.uscourts.gov/orders/docs/2026/04/25-5452LDSN3.pdf

22. 25-5452 - U.S. Court of Appeals for the D.C. Circuit, accessed July 16, 2026, https://media.cadc.uscourts.gov/orders/docs/2025/12/25-5452LDSN2.pdf